# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

Filed: May 27, 2026

* * * * * * * * * * * * * * *     *
DENYCE IVERSON,                   *       PUBLISHED
                                  *
          Petitioner,             *       No. 22-718V
                                  *
v.                                *       Special Master Nora Beth Dorsey
                                  *
SECRETARY OF HEALTH               *       Dismissal; Influenza ("Flu") Vaccine;
AND HUMAN SERVICES,               *       Guillain-Barré Syndrome ("GBS");
                                  *       Chronic Inflammatory Demyelinating
          Respondent.             *       Polyneuropathy ("CIDP"); Functional
                                  *       Neurological Disorder ("FND").
* * * * * * * * * * * * * * *     *

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
Naseem Kourosh, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION[1]

On June 28, 2022, Denyce Iverson ("Petitioner") filed a petition in the National Vaccine Injury Program[2] alleging that as a result of receiving an Afluria influenza ("flu") vaccine and a

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018) ("Vaccine Act" or "the Act"). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C.A. § 300aa.

23-valent pneumococcal polysaccharide ("Pneumovax-23") vaccine[3] on August 11, 2019, she suffered chronic inflammatory demyelinating polyneuropathy ("CIDP").  Petition at ¶¶ 2, 8 (ECF No. 1).  Petitioner further alleges she suffered Guillain-Barré syndrome ("GBS") as a result of her August 11, 2019 flu vaccination.[4]  Pet. Mot. at 1.  Respondent argued against compensation, stating that "this case is not appropriate for compensation under the Vaccine Act."  Respondent's Report ("Resp. Rept.") at 1 (ECF No. 30).

After carefully analyzing and weighing the evidence presented in this case in accordance with the applicable legal standards,[5] the undersigned finds that Petitioner has failed to provide preponderant evidence that the flu vaccination caused her illness.  Thus, Petitioner has failed to satisfy her burden of proof under Althen v. Secretary of Health & Human Services, 418 F.3d 1274, 1280 (Fed. Cir. 2005).  Accordingly, Petitioner is not entitled to compensation.

## I.    ISSUES TO BE DECIDED

The parties dispute Petitioner's diagnosis.  Joint Submission, filed May 1, 2025, at 4 (ECF No. 73).  Petitioner contends her diagnosis is GBS.  Pet. Mot. at 1, 22.  Respondent disagrees that Petitioner has provided preponderant evidence of GBS.  Resp. Response to Pet. Mot. ("Resp. Response"), filed July 7, 2025, at 26 (ECF No. 77).  Instead, Respondent argues that Petitioner suffered from a functional neurological disorder ("FND").  Id. at 29.  The parties also dispute the onset of Petitioner's condition.  Joint Submission at 1.

As to causation, the parties dispute all three Althen prongs.  Joint Submission at 1. Specifically, the parties dispute whether Petitioner has provided preponderant evidence that the flu vaccine can cause her condition; whether Petitioner provided preponderant evidence that flu vaccine did cause her condition; and whether the onset of Petitioner's condition occurred within a medically acceptable timeframe with respect to her August 11, 2019 flu vaccination and consistent with her proposed causal theory.  Id.

---

[3] Pneumovax-23, a polysaccharide-type pneumococcal vaccine, is a noncovered vaccine.  See 42 C.F.R. § 100.3; see also, e.g., Cielencki v. Sec'y of Health & Hum. Servs., No. 15-632V, 2015 WL 10767150, at *2 (Fed. Cl. Spec. Mstr. Dec. 22, 2015).  Therefore, any condition allegedly caused by Pneumovax-23 is not compensable.

[4] While Petitioner alleges an injury of CIDP in her petition, she alleges an injury of GBS in her motion for a ruling on the record.  See Petition at ¶¶ 2, 8; Petitioner's Motion for a Ruling on the Record ("Pet. Mot."), filed Apr. 29, 2025, at 1 (ECF No. 72).

[5] Although the undersigned has reviewed all of the information filed in this case, only those filings and records that are most relevant will be discussed.  See Moriarty v. Sec'y of Health & Hum. Servs., 844 F.3d 1322, 1328 (Fed. Cir. 2016) ("We generally presume that a special master considered the relevant record evidence even though he does not explicitly reference such evidence in his decision."); see also Paterek v. Sec'y of Health & Hum. Servs., 527 F. App'x 875, 884 (Fed. Cir. 2013) ("Finding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered.").

## II.    BACKGROUND

### A.    Procedural History

On June 28, 2022, Petitioner filed a petition requesting compensation followed by medical records.[6]  Petition; Pet. Exhibits ("Exs.") 1-12.  The case was then assigned to the undersigned.  Notice of Reassignment dated Aug. 29, 2023 (ECF No. 22).  Respondent filed a Rule 4(c) report on January 11, 2024, arguing against compensation.  Resp. Rept. at 1.

On May 6, 2024, Petitioner filed an expert report from Dr. Yuval Shafrir.  Pet. Ex. 17. On September 23, 2024, Respondent filed an expert report from Dr. Collin Kreple.  Resp. Ex. A.

At the request of the parties, the undersigned set deadlines for additional expert reports. Order dated Oct. 24, 2024 (ECF No. 63).  On March 6, 2025, Petitioner reported that she did not intend to file an additional expert report and requested that the case be "briefed on the current record."  Pet. Status Rept., filed Mar. 6, 2025 (ECF No. 69).  The undersigned set a briefing schedule for a ruling on the record.  Order dated Mar. 7, 2025 (ECF No. 70).

Petitioner filed her motion for a ruling on the record on April 29, 2025.  Pet. Mot. Respondent filed his responsive brief on July 7, 2025, and Petitioner filed a reply on August 8, 2025.  Resp. Response; Pet. Reply to Resp. Response ("Pet. Reply"), filed Aug. 15, 2025 (ECF No. 80).

This matter is now ripe for adjudication.

### B.    Factual History

#### 1.    Summary of Medical Records[7]

On August 11, 2019, Petitioner received a flu vaccine, administered in her left deltoid, and a Pneumovax-23 vaccine, administered in her right deltoid, at CVS pharmacy.  Pet. Ex. 2 at 4-5; Pet. Ex. 12 at 1.  At the time of vaccination, Petitioner was 28 years old and worked at CVS. Pet. Ex. 6 at 85.  She had a medical history that included asthma, recurrent bronchitis and pneumonia, anxiety, panic attacks involving numbness in the lips and fingers, pelvic pain, chronic hip pain, hypoglycemia, abdominal pain and bloating, irritable bowel syndrome ("IBS") with constipation, gastrointestinal reflux disease ("GERD"), myopia, refractive disorder (of the eyes), shingles, tonsillectomy, and adenoidectomy.  Pet. Ex. 1 at 8; Pet. Ex. 3 at 2-3, 6-7, 11-12, 14-15, 20, 23, 29-30, 34, 80-83, 89-90; Pet. Ex. 4 at 2-4; Pet. Ex. 5 at 29; Pet. Ex. 6 at 85, 94; Pet. Ex. 11 at 3, 6.  Petitioner previously received flu vaccines on August 31, 2014 and on September 7, 2018.  Pet. Ex. 12 at 1; Pet. Ex. 2 at 4.

---

[6] Petitioner continued to file medical records throughout litigation.

[7] This summary of medical records is taken from the parties' briefs, with edits from the undersigned, as the undersigned finds they provided an accurate representation of the records. See Pet. Mot. at 2-11; Resp. Response at 2-23.

### a.    2019 Record Summary

On August 12, 2019, the day after her vaccinations, Petitioner presented to a walk-in care clinic at Oroville Hospital, reporting fever and left upper arm pain and warmth which began that day. Pet. Ex. 1 at 2. She reported that she had received flu and Pneumovax-23 vaccinations the previous day and may have been having a reaction to them but stated that she had not had a reaction to vaccines in the past. Id. On examination, she was afebrile, but her left upper arm had a "large erythematous patch, with [four centimeter by two centimeter] wheals to the medial aspect, [and] significant warmth." Id. at 2-3. The diagnosis was "[a]dverse effect of other viral vaccines," "[a]llergic reaction to flu vaccine," "[a]llergy status to serum and vaccine status," and "[a]llergic reaction to [Pneumovax-23] vaccine." Id. at 4. Petitioner was given an injection of Decadron (dexamethasone, a corticosteroid) in her right gluteus. Id.; Pet. Ex. 6 at 78. She reported feeling dizziness, tiredness, and bilateral upper extremity weakness after the Decadron injection. Pet. Ex. 1 at 4. She was advised that these are common side effects of this medication. Id. Petitioner was discharged home with instructions to use cold compresses, take over-the-counter analgesics, and avoid combining flu vaccines and pneumonia vaccines in the future. Id. She was also advised to go to the emergency department ("ED") if she had symptoms such as swelling, pain, racing heartbeat, shortness of breath, chest pain, or anaphylactic shock. Id.

Later the same evening, Petitioner presented to the ED at Oroville Hospital for bilateral leg numbness and weakness. Pet. Ex. 3 at 33. She reported three days of non-productive cough that resolved, followed by a flu vaccination in her left arm the previous day (August 11); she then woke up that morning (August 12) with left arm redness, swelling, and pain radiating to her left breast. Id. She stated that she went to a clinic earlier in the day and was given a steroid injection for a possible allergic reaction, after which she felt "w[]oozy" and began to experience leg numbness that progressively worsened. Id. She stated that her legs felt heavy and she was unable to move them at all, that the numbness was spreading into her hands and face, and that she was experiencing dizziness, nausea, subjective fever, diaphoresis (excessive sweating), and urinary hesitancy. Id. On examination, Petitioner was afebrile, ill-appearing, and had left upper extremity erythema and tenderness, and decreased sensation in her hands and bilateral lower extremities. Id. at 35. Bloodwork, urinalysis, electrocardiogram ("EKG"), head computed tomography ("CT"), and chest X-ray results were all within normal limits, other than a finding of low serum magnesium. Id. at 35-36, 78-79.

At a tele-neurology consult with Asish Ghoshal, M.D., in the ED that evening, Petitioner reported bilateral leg weakness, generalized numbness, and an inflamed left arm after a flu vaccination. Pet. Ex. 6 at 81. She stated that she had received a flu vaccination the previous day, that her left arm had been red and swollen, that she sought treatment at urgent care, where they administered a Decadron injection, and, within 10 minutes of the injection, she felt dizzy and unable to move her legs. Id. Dr. Ghoshal reviewed Petitioner's physical examination findings, lab work, imaging, and performed a stroke assessment. Id. at 82-83. His impression was "[l]ocal reaction / [p]ossible cellulitis left arm at injection site of flu shot. Atypical symptoms of loss of use of both legs. Considerations include [GBS] related to flu shot, hyster[i]cal conversion[,] and others." Id. at 83. He recommended that Petitioner be admitted to the hospital. Id.

4

ED physician Edwin Yuen, M.D., admitted Petitioner with an assessment of sepsis secondary to left upper arm cellulitis, possible GBS, hypomagnesemia likely due to decreased oral intake, and deep vein thrombosis prophylaxis.  Pet. Ex. 3 at 36.  He ordered intravenous immunoglobulin ("IVIG") for possible GBS and planned to treat Petitioner with Ancef (cefazoline, an antibiotic) for sepsis and cellulitis.  Id.

On August 13, 2019, Petitioner had an inpatient neurology consult with Dr. John G. Schmidt,[8] and Petitioner reported a history similar to what she had reported at the ED the previous day, but added that, after the Decadron injection, she felt like she was drunk and needed help walking to her car.  Pet. Ex. 5 at 29.  She also reported that, in late July and early August, she went surfboarding for four days, but "denied any infectious exposure," but was sleepy and tired for the following two weeks.  Id.  She further stated that after one dose of IVIG in the ED she could move her legs.  Id.  In the history of the present illness, Dr. Schmidt noted that Petitioner had "atypical symptoms" including loss of movement of both legs and numbness in the upper and lower extremities.  Id.  Petitioner's neurological exam was normal other than slightly reduced (4/5) strength in the lower extremities and her sensory examination was "somewhat inconsistent, respecting midline in the face and torso."  Id. at 30.  Reflexes were 2/4 bilaterally.  Id.  Dr. Schmidt noted Petitioner "had difficulty with the formal exam as she had no mobility."  Id.  Her cerebrospinal fluid ("CSF") analysis and culture were normal.  Id.; Pet. Ex. 3 at 44.

Dr. Schmidt's impression was "left upper extremity cellulitis and atypical presentation of acute inflammatory demyelinating polyneuropathy [("AIDP")]," and "many inconsistent neurological findings," including normal distal strength and "nonphysiological sensory deficits." Pet. Ex. 5 at 30-31.  He noted that Petitioner "may be suffering from a conversion reaction," but that he would "defer to [p]sychiatry."  Id. at 31.  He noted that Petitioner was responding well to IVIG, and he recommended one more dose.  Id.  Dr. Schmidt also recommended occupational therapy ("OT") and physical therapy ("PT") for mobility.  Id.

Petitioner had a pulmonology consult the same day with Sidharth Bagga, M.D.  Pet. Ex. 6 at 85-87.  At the time of the consult, Petitioner was able to move all four extremities, but had weakness of the lower extremities, with the left lower extremity stronger than the right.  Id. at 85. Petitioner also reported that she felt weak and "not her usual self."  Id.  Physical examination was normal except that her right lower extremity strength was 4/5 whereas strength in her other extremities were 5/5.  Id. at 86-87.  Dr. Bagga also reviewed Petitioner's lab work and imaging. Id. at 87.  His assessment was "[a]cute neurologic weakness status post Decadron and [Pneumovax 23] vaccine.  I suspect overall patient's neurologic limitation is related to steroid administration.  [GBS] remains a possibility, but overall suspicion remains low[;] can cont[inue] IVIG per neuro rec[ommendation]s."  Id.

---

[8] At the time he provided care to Petitioner, Dr. Schmidt was a Clinical Professor of Neurology and Physical Medicine and Rehabilitation at California Northstate University College of Medicine.  See Pet. Ex. 5 at 27.

On August 16, 2019, Petitioner was discharged from the hospital. Pet. Ex. 3 at 44. The discharge summary noted that she had received five days of Ancef antibiotic, and that her cellulitis had resolved. Id. at 45. It also noted that her presentation "shared some component with possible [GBS] although atypical," that she had been evaluated by two neurologists, and received two doses of IVIG, and that her symptoms had "much improved." Id. It further noted that magnetic resonance imaging ("MRI") with and without contrast of the brain, thoracic spine, and lumbar spine were unremarkable. Id.; see also id. at 64-67, 74-75 (MRI reports). The reading radiologist noted that Petitioner's MRI of the brain had "no evidence for a demyelinating process." Id. at 75. On examination, Petitioner's reflexes, muscle strength, and sensation were normal, but she was still shaky, but ambulatory with a walker and progressively improving. Id. at 45 ("The patient has 5/5 motor strength upper and lower extremities, 2+ deep tendon reflex[es]. . . . Sensation testing: No deficit."). Discharge diagnoses were sepsis due to left upper extremity cellulitis, possible GBS, hypomagnesemia, and chronic co-morbidities (listed as asthma, IBS, peptic ulcer disease, GERD, and panic disorder). Id. at 44. Petitioner was instructed to follow up with her primary care physician ("PCP") and with her neurologist, Dr. Schmidt. Id. at 46.

Petitioner underwent an outpatient PT evaluation of August 20, 2019. Pet. Ex. 6 at 92. The date of injury was listed as August 12, 2019, the treatment diagnoses were listed as "[g]eneralized muscle weakness" and "[o]ther abnormalities of gait and mobility," and the PT diagnosis was listed as "possible" GBS. Id. Petitioner reported that, on August 11, she had received flu and Pneumovax-23 vaccinations, "both in [the] left arm," and had awakened the next day, August 12, with "left arm redness, pain[,] and swelling to the injection site with pain radiating to her left breast." Id. at 94. She went to urgent care, where she received a steroid injection for a possible allergic reaction. Id. She then began feeling "woozy" and needed assistance ambulating, and, in the following hour, experienced numbness and weakness in both lower extremities, which spread to her hands, face, and upper extremities. Id. Petitioner also reported pain in her left shoulder, hips, legs, and feet, which she rated as 8/10 at worst and 5/10 at best and currently, and she described the pain as worse early in the morning and later in the day. Id. at 95. On physical examination, Petitioner had reduced strength in both upper and lower extremities (strength measurements ranged from 2/5 to 5/5), decreased balance, walker use and abnormal gait, dizziness when going from all fours to standing, increased tone in the lower extremities, and upper extremity tremors when moving the arms above shoulder height. Id. at 96-98. An assessment of Petitioner's gait "deviations" included "[d]ecreased stride length on [right], decreased stride length on [left], pressing legs excessively in a posterior direction forward center of mass, [and] supporting significant weight on walker." Id. at 97. Petitioner also had abnormal gait and used a walker for ambulation but required minimal assistance. Id. The plan was PT and a home exercise program, and Petitioner was also referred to OT. Id. at 98-99.

On September 30, 2019, Petitioner saw her optometrist, Geoffrey Carlson, D.O., reporting a recent GBS diagnosis, after which she had begun experiencing pressure behind her eyes, deteriorating vision (causing her to squint while wearing glasses), and a room-spinning sensation due to objects in her peripheral vision moving. Pet. Ex. 4 at 5. Dr. Carlson's impression was bilateral myopia, and the plan was eyeglasses and follow-up visits for refraction. Id. at 6.

Petitioner presented to nurse practitioner ("NP") Eric Vincent to establish care as her PCP on October 2, 2019. Pet. Ex. 6 at 121. She reported that since her hospital stay for possible GBS, her vision had worsened and her glasses were not working as well, and that she was experiencing dizziness, lower extremity weakness, muscle fatigue, and shortness of breath. Id. She was ambulating with a walker. Id. The neurological examination noted normal upper extremities strength of 5/5, a negative Romberg test, and bilateral decreased deep tendon reflexes. Id. at 123. Assessment was GBS and weakness, and NP Vincent ordered several tests and labs, including a sleep study (polysomnogram), carotid duplex scan, and EKG, and made referrals to other specialties. Id. at 123-24.

Approximately two months after vaccination, on October 10, 2019, Petitioner saw NP Vincent, who reviewed results from an October 3, 2019 EKG, which was normal. Pet. Ex. 6 at 142. The same day, she underwent an echocardiogram for reported dizziness. Pet. Ex. 3 at 47. Other than trace mitral regurgitation and trace tricuspid regurgitation, the results were normal. Id. at 48. Petitioner underwent a carotid duplex scan on October 11, 2019. Id. at 68. The indication was dizziness, and the results were normal. Id. at 68-70. The same day, Petitioner received a referral for a sleep study due to complaints of daytime sleepiness or fatigue, dry mouth or sore throat upon waking, restlessness during sleep, snoring, sudden awakenings with a sensation of gasping or choking, weight gain of 20 pounds or more in the previous six to 12 months, allergies, and asthma. Id. at 50; see also Pet. Ex. 6 at 146. It does not appear Petitioner underwent a sleep study as results of a sleep study were not filed.

Petitioner returned to see NP Vincent on October 17, 2019, noting that an October 10, 2019 allergy panel showed that Petitioner had multiple allergies, including peanuts. Pet. Ex. 6 at 152, 154. A physical examination was normal; however, the physical examination did not include a neurological assessment. Id. at 153. NP Vincent ordered a blood test for celiac disease to evaluate Petitioner's reported nausea and vomiting. Id. at 153-55.

On October 23, 2019, Petitioner saw cardiologist Deepak Khanna, M.D., for dizziness. Pet. Ex. 6 at 164. She reported intermittent dizziness with head movement to the left or right, which she felt was due to her GBS and brought on by Ancef that was administered during her hospitalization in August. Id. Physical examination was normal, but did not include a neurological assessment. Id. at 165. Dr. Khanna noted that Petitioner's echocardiogram and EKG were within normal limits. Id. at 166. He provided reassurance and encouraged her to continue seeing her PCP and doing PT. Id.

Petitioner saw Dr. Bagga as an outpatient on October 29, 2019, reporting that she was waking up in the middle of the night gasping for air. Pet. Ex. 6 at 168. He prescribed Symbicort (an inhaler) for severe persistent asthma. Id. He also ordered a pulmonary function study, which was performed the following day (October 30) and was normal. Id. at 168, 174-75.

On November 1, 2019, Petitioner saw obstetrician/gynecologist Matthew Bazzani, M.D., for a birth control consult, reporting that she had been diagnosed with GBS, and that her "PCP linked it to her [flu] vaccine." Pet. Ex. 6 at 180. At this visit, Petitioner reported weakness and fatigue. Id.

7

At a PT session on November 12, 2019, Petitioner reported she had been quite ill the previous week and was nauseated and unable to sleep and eat. Pet. Ex. 6 at 183. She was evaluated at Gridley Hospital and her condition was attributed to stress. Id. Records from this hospital encounter were not filed.

Petitioner returned to NP Vincent on November 14, 2019. Pet. Ex. 6 at 186. Her history of GBS was documented. Id. She reported good upper body strength, but she had tremors when using her arms or increasing her movement. Id. She also had pain from falling on her right knee. Id. Petitioner's mother reported that Petitioner had stomach pain and a few vomiting episodes. Id. On examination, Petitioner had tenderness in her right knee, but right knee X-rays were normal. Id. at 187-88; Pet. Ex. 3 at 63. The examination did not include a neurological assessment. Pet. Ex. 6 at 187. NP Vincent prescribed omeprazole (a proton pump inhibitor) for upset stomach. Id. at 188.

On November 18, 2019, Petitioner returned to pulmonologist Dr. Bagga, reporting that she had been doing well and had had no nocturnal awakenings since starting Symbicort. Pet. Ex. 6 at 192. Physical examination was normal but did not include a neurological assessment. Id. at 193. Dr. Bagga advised her to continue with Symbicort and exercise as tolerated. Id. at 192.

The next day, on November 19, 2019, Petitioner had a follow-up visit with NP Vincent. Pet. Ex. 6 at 196. Again, the history of GBS was noted. Id. She still had stomach upset, despite taking omeprazole. Id. She also reported that she was still weak, continued to use her walker, was experiencing increased tremors toward the end of PT sessions, was still having knee pain, and was feeling numbness and tingling in her feet that would radiate up her legs. Id. NP Vincent provided her with a knee brace and referred her to gastroenterology. Id. at 198.

On November 21, 2019, Petitioner underwent an electromyography/nerve conduction study ("EMG/NCS")[9] for complaints of "numbness, pain[,] and tingling in feet." Pet. Ex. 16 at 6-16. The results were reviewed by James Won, M.D. Id. at 6. His impression noted

> [t]hese findings are suggestive of right-sided peroneal neuropathy at the fibular head, with electrodiagnostic evidence of chronic denervation and reinnervation changes that are seen from the innervated muscle distal to the fibular head (right tibialis anterior muscle) . . . . There is otherwise no electrodiagnosis evidence of large-fiber peripherical neuropathy or lumbosacral radiculopathy . . . at this time.

Id.

---

[9] Electromyography, or EMG, is "an electrodiagnostic technique for recording the extracellular activity (action potentials and evoked potentials) of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation." Electromyography, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15854 (last visited May 15, 2026). Nerve conduction studies, or NCS, are "the measurement of the conduction velocity and latency of peripheral nerves." Nerve Conduction Studies, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=109043 (last visited May 15, 2026).

Petitioner saw Dr. Schmidt for her first outpatient neurology follow-up on November 26, 2019. Pet. Ex. 5 at 26. She reported that PT and OT had been very helpful, but that she still had difficulty walking and used a walker. Id. She also complained of continued numbness and tingling in her feet that radiated up her legs and decreased strength and endurance in her lower extremities but not her upper extremities. Id. Dr. Schmidt reviewed the EMG/NCS results, which he noted showed no evidence of large fiber peripheral neuropathy. Id. He also noted that EMG/NCS showed "right-sided peroneal neuropathy at the fibular head." Id. at 25. On neurological examination, Petitioner had normal strength in the upper extremities, slightly reduced (4/5) strength in the lower extremities, absent (0/4) reflexes in the upper and lower extremities, decreased temperature and vibration sensation in the distal upper and lower extremities, and a "trem[u]lous, almost ataxic gait."[10] Id. at 26. Dr. Schmidt's impression was a "recent history of GBS, possibly [CIDP]." Id. He recommended Petitioner start gabapentin and outpatient IVIG infusions. Id. at 26-27.

On December 18, 2019, over four months after vaccination, Petitioner saw NP Vincent for knee pain that persisted despite wearing a knee brace and increased after sitting in the car. Pet. Ex. 6 at 227. She also described fatigue and a "freezing pain" in both lower extremities, which she related to peripheral neuropathy. Id. On examination, she had some right knee laxity and tenderness. Id. at 228. There was no neurological assessment. Id. NP Vincent recommended continuing PT and use of the knee brace. Id.

Petitioner received her first outpatient IVIG infusion on December 23, 2019. Pet. Ex. 6 at 236.

b.        2020 Record Summary

On January 6, 2020, Petitioner returned to optometrist Dr. Carlson for a recheck of her refraction. Pet. Ex. 4 at 7. She also reported intermittent diplopia (double vision) starting the previous month. Id.

Petitioner received an IVIG infusion January 20, 2020. Pet. Ex. 6 at 252. Petitioner continued to receive IVIG infusions throughout 2020. See id. at 280 (February 17, 2020), 304 (March 17, 2020), 386 (August 21, 2020), 402 (September 18, 2020), 435 (October 16, 2020), 455 (November 13, 2020), 461 (December 11, 2020). She switched from Privigen IVIG to Gamunex IVIG after experiencing nausea on Privigen IVIG. See, e.g., Pet. Ex. 5 at 23.

On January 23, 2020, Petitioner saw NP Vincent, reporting that her lower extremity weakness had persisted and that she experienced extreme fatigue following her first IVIG infusion. Pet. Ex. 6 at 254. NP Vincent ordered lab tests and provided a note excusing Petitioner from work until June 15, 2020. Id. at 255-56, 357. Petitioner followed up with NP Vincent on

---

[10] Ataxic gait is "an unsteady, uncoordinated walk, with a wide base and the feet thrown out, due to some form of ataxia," or the "failure of muscular coordination; irregularity of muscular action." Ataxic Gait, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition? id=67701 (last visited May 15, 2026); Ataxia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=4630 (last visited May 15, 2026).

9

January 30 to review her test results, which were largely negative/normal, including for antinuclear antibodies, rheumatoid factor, C-reactive protein, uric acid, and hemoglobin A1C. Id. at 264-68. Petitioner's vitamin D level was low, and NP Vincent prescribed a vitamin D supplement. Id. at 268-69.

NP Vincent saw Petitioner on February 27, 2020, to request crutches for an unstable gait that she attributed to her to GBS, which he ordered. Pet. Ex. 6 at 288-90.

Petitioner presented to urgent care for left arm pain on March 3, 2020. Pet. Ex. 6 at 297. She reported that she felt the pain at the infusion site following her IVIG infusion on February 17, which then subsided, but when she began riding the bike at PT earlier that day (March 3), she noticed a throbbing pain and redness at the site. Id. A physical examination revealed a two-centimeter firm area, and impression was left forearm phlebitis (inflammation of the vein). Id. at 298. The plan was to apply warm compresses and inform the infusion center of what occurred. Id.

On April 20, 2020, Petitioner saw NP Vincent via telemedicine for ear pain, nausea, vomiting, and throat pain. Pet. Ex. 6 at 309. She was unable to receive her IVIG treatment that month and had been weak and fatigued. Id. NP Vincent prescribed Zithromax (azithromycin, an antibiotic) and Zofran (ondansetron, an antinausea medication). Id. at 310. Petitioner saw NP Vincent in person the next day (April 21), reporting that her ear pain was better but that she still had nausea and sore throat. Id. at 312. NP Vincent diagnosed Petitioner with pharyngitis and prescribed acyclovir (an antiviral). Id. at 313-14. She then saw NP Vincent via telemedicine on April 28, reporting that she was much better, but an area where she had shingles before (at an unspecified time) had become pruritic. Id. at 318. He advised her to continue acyclovir and stay hydrated. Id. at 319.

Petitioner next saw NP Vincent on May 7, 2020, via telemedicine, reporting improvement at the site of her previous shingles and improvement in her weakness related to GBS. Pet. Ex. 6 at 321.

Petitioner returned to Dr. Schmidt for GBS follow-up on May 18, 2020. Pet. Ex. 5 at 22. Dr. Schmidt noted that Petitioner started IVIG therapy after her last visit on November 26, 2019, and she was also on gabapentin. Id. She reported that the IVIG treatments had improved her strength, and she was able to walk one mile continuously, but that she experienced nausea for five days after each treatment, which was well controlled with Zofran. Id. She was not attending PT due to COVID-19 concerns but was exercising at home. Id. On examination, she walked with the assistance of Canadian crutches[11] but was otherwise normal. Id. at 23. The neurological examination did not document Petitioner's reflexes. Id. Dr. Schmidt's impression was GBS with CIDP and adverse drug effect with IVIG. Id. His plan was to switch from

---

[11] Canadian crutches, also known as triceps crutches, consist "of two uprights extending halfway between the elbow and shoulder, with a cross piece for the hand and a curved upper arm part against which the subject leans the upper arm." Triceps Crutch, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=67701 (last visited May 15, 2026).

10

Privigen to Gamunex for IVIG; he also advised Petitioner to continue Zofran and consider additional anti-nausea medication if needed. Id.

On June 3, 2020, Petitioner saw NP Vincent via telemedicine for a dental infection, for which he prescribed clindamycin (an antibiotic). Pet. Ex. 6 at 328, 330. Petitioner reported that she had been taking gabapentin and Tylenol for her GBS. Id. at 328. On June 11, 2020, Petitioner again saw NP Vincent via telemedicine, reporting that her tooth pain had improved somewhat, and that she felt that her GBS was gradually improving, particularly with PT, but that she did not feel ready to return to work due to weakness and shakiness when going from sitting to standing. Id. at 347. NP Vincent provided her with a note excusing her from work until August 15, 2020. Id. at 350.

One year after vaccination, August 11, 2020, Petitioner saw NP Vincent, reporting that since having GBS, she did not feel the urge to urinate and had issues with incontinence, which had not improved with PT and pelvic strengthening techniques. Pet. Ex. 6 at 373. NP Vincent provided her with a note excusing her from work until January 1, 2021 and referred her to urology. Id. at 374-76. He also ordered a retroperitoneal ultrasound, which she underwent on August 13, and which was normal except for a possible non-obstructing kidney stone. Id. at 63. Petitioner again saw NP Vincent on August 19, via telemedicine, reporting that she was experiencing left-sided pain radiating up to her left shoulder, and that she had continued having intermittent constipation and stool incontinence. Id. at 379. NP Vincent recommended that she take a daily laxative and see colorectal surgery. Id. at 381.

On August 20, 2020, Petitioner saw urology physician assistant ("PA") Keith Myers on referral from NP Vincent for urinary symptoms since contracting GBS one year prior. Pet. Ex. 6 at 382, 428. PA Myers ordered a cystoscopy. Id. at 382-83.

On September 11, 2020, Petitioner saw NP Vincent, reporting that she may have passed a kidney stone the day before, as she had intense pain and difficulty urinating. Pet. Ex. 6 at 395. She also reported that, as to her GBS, she was still unstable when walking but was benefiting from IVIG infusions. Id. NP Vincent ordered an abdomen and pelvis CT, which Petitioner underwent on October 8, 2020 and was unremarkable. Pet. Ex. 3 at 61-62.

Petitioner returned to NP Vincent on October 14, 2020, for right flank pain radiating to her inner groin, as well as recent nausea and vomiting. Pet. Ex. 6 at 422. NP Vincent reviewed the results of recent labs and imaging, diagnosed Petitioner with right flank pain, prescribed Carafate (sucralfate, an anti-ulcer medication), and advised her to stay hydrated. Id. at 426-27.

Petitioner was next seen by urology PA Myers on October 16, reporting severe right flank pain radiating to her inner groin and a possible passed kidney stone two weeks prior. Pet. Ex. 6 at 429. He prescribed tramadol for pain and again recommended a cystoscopy. Id. On October 19, 2020, Petitioner saw NP Vincent via telemedicine, reporting that she had less back and flank pain on Carafate, but still had nausea and dysuria. Id. at 438.

On October 21, 2020, Petitioner returned to Dr. Schmidt, reporting that she was tolerating IVIG therapy better and that her nausea was well controlled with Zofran. Pet. Ex. 5 at 19.

11

However, her endurance remained poor, she still had days where she was debilitated, and had to reschedule a few PT sessions due to significant weakness. Id. On examination, Petitioner had an unstable gait with tremor, with improved stability of her gait with assistance of Canadian crutches, and all other findings were normal. Id. at 20. Dr. Schmidt's impression remained GBS with CIDP, with adverse drug effect to Privigen IVIG. Id. He recommended that Petitioner continue Gamunex IVIG therapy, PT, and her home exercise program. Id.

### c.      2021 Record Summary

Petitioner continued to receive monthly Gamunex IVIG infusions throughout 2021. See Pet. Ex. 6 at 476, 498, 531, 551, 564, 586, 599, 623, 649, 660.

She also continued to see NP Vincent for follow-up throughout 2021. See, e.g., Pet. Ex. 6 at 487. On February 16, 2021, Petitioner reported that she was continuing PT but felt that her weakness may be worsening, as her feet felt heavier than usual and she had recently had trouble climbing the stairs to her home. Id. She also often felt shaky and trembled and was also still experiencing urinary incontinence and retention, for which she requested a referral to another urologist. Id. Petitioner further reported that she was experiencing left ankle pain. Id. She also stated that her medical condition was taking a toll on her emotional well-being. Id. NP Vincent ordered labs, provided a psychiatry referral, and ordered left ankle X-rays. Id. at 489-90.

On February 18, 2021, Petitioner returned to PA Myers, reporting that she had been doing bladder training and had not had urinary incontinence for eight to nine months, but that she was still experiencing urinary retention and frequency. Pet. Ex. 6 at 493. Petitioner requested a referral to another urology provider, which PA Myers provided, and she agreed to undergo a cystoscopy. Id. at 493, 495. She also underwent lab tests which showed a low vitamin B-12 level (129; reference range 180-914 PG/mL). Pet. Ex. 8 at 22-26.

Petitioner underwent a flexible cystoscopy, performed by urologist, Balakrishna Sundar, M.D., for GBS and voiding issues on March 2, 2021. Pet. Ex. 6 at 506. Dr. Sundar found no abnormalities. Id. He informed Petitioner that some of her urinary issues could be due to GBS and recommended that she not be placed on any other medications. Id.

On March 10, 2021, Petitioner returned to NP Vincent, requesting and receiving a vitamin B-12 injection in her right deltoid. Pet. Ex. 6 at 515, 517-18. She then received three additional weekly B-12 injections. Id. at 522-25, 540-47.

Petitioner underwent another retroperitoneal ultrasound on March 15, 2021. Pet. Ex. 3 at 56. The indication was urinary hesitancy and frequency. Id. The scan was normal. Id. at 56-57.

On March 22, 2021, Petitioner saw Dr. Schmidt, reporting that she was continuing to tolerate the Gamunex IVIG therapy well, with no significant nausea, and that she had marked improvement in her energy level following treatments, though she did experience some mild body soreness for a "couple of days" after each treatment. Pet. Ex. 5 at 17. She also had been feeling lethargic, tested positive for vitamin B-12 deficiency, and had been receiving B-12 injections. Id. Petitioner was experiencing a loss of control of her feet, causing her to trip. Id.

Dr. Schmidt's impression remained GBS with CIDP and adverse reaction to Privigen IVIG. Id. at 18.

The following day, March 23, 2021, Petitioner saw PA Myers for continued urinary symptoms. Pet. Ex. 6 at 537. He reviewed her recent test results, which were normal, and his assessment was dysfunctional voiding and urinary hesitancy. Id. at 537, 539. He provided reassurance and recommended good hydration. Id. at 539.

On April 7, 2021, Petitioner saw NP Vincent, reporting transient, intense body aches after her last B-12 injection, and he elected to hold off on further B-12 injections. Pet. Ex. 6 at 548-50. Petitioner returned to NP Vincent on May 12, 2021, again reporting that she did not feel well and experienced nausea after her last B-12 injection. Id. at 555. She also reported pain from her left shoulder down her arm and limited range of motion. Id. A physical examination noted C6 point tenderness and paraspinal tenderness. Id. at 556. Labs drawn May 7, 2021, showed a borderline low B-12 level (179; reference range 180-914 PG/mL), and a sublingual B-12 supplement was recommended. Id. at 557-58.

Petitioner again saw NP Vincent on May 25, 2021. Pet. Ex. 6 at 561. She reported that she may be getting weaker, was fatigued, and was nauseated due to infusion therapy, and thus did not feel that she could return to work. Id. NP Vincent provided her with a note excusing her from work until September 15, 2021. Id. at 563.

On June 22, 2021, Petitioner saw urology PA Myers, reporting continued urinary issues and that she constantly felt like she had an infection. Pet. Ex. 6 at 570. PA Myers performed a urinalysis, which was negative, and prescribed medications for incontinence. Id. at 572.

Petitioner saw NP Vincent via telemedicine for her B-12 deficiency on June 28, 2021, and he recommended that she stay on oral B-12 supplementation. Pet. Ex. 6 at 575-77. Petitioner returned to NP Vincent on July 12, via telemedicine, reporting dizziness and feelings of spinning, as well as a recent fall. Id. at 590-91. And on August 30, 2021, Petitioner again saw NP Vincent, reporting that she felt unwell after her recent IVIG infusion, and that she continued to be fatigued despite taking an oral B-12 supplement. Id. at 626. NP Vincent ordered labs. Id. at 628. He also provided Petitioner with a note excusing her from work until September 1, 2023. Id. at 631. On September 7, 2021, Petitioner reported to NP Vincent that she was doing well on oral B-12 supplementation, and he ordered additional labs. Id. at 634-36.

On September 20, 2021, Petitioner returned to Dr. Schmidt, reporting that she continued to do very well on the Gamunex IVIG infusions, though she had mild malaise for two to three days after each treatment. Pet. Ex. 5 at 13. She also reported an ongoing tremor, which worsened as she approached her infusion date and with activity, and which was now affecting her quality of life, particularly her handwriting. Id. Dr. Schmidt noted "[i]ntention tremor" on examination and added essential tremor to his impression. Id. at 14. His plan was for a trial of Mysoline (primidone, an epilepsy medication). Id.

On November 30, 2021, Petitioner visited NP Vincent, where she requested and received a fifth B-12 injection (in her right deltoid). Pet. Ex. 6 at 675-78.

13

Petitioner next saw Dr. Schmidt on December 20, 2021, reporting that her tremor was well-controlled on Mysoline, but that the medication interacted with her birth control to cause frequent menses. Pet. Ex. 5 at 10. He prescribed propranolol (a beta blocker) to replace Mysoline. Id.

### d.      2022 Record Summary

On January 13, 2022, Petitioner received a sixth B-12 injection (in her right deltoid). Pet. Ex. 6 at 684-85. She also continued to receive IVIG infusions throughout 2022. Id. at 690, 712, 731, 750.

Petitioner saw NP Vincent February 10, 2022, reporting that her energy levels had not improved on the B-12 injections and that she was experiencing muscular pain in both shoulders. Pet. Ex. 6 at 698. NP Vincent ordered bilateral shoulder X-rays, which Petitioner underwent the next day, and which were unremarkable. Id. at 701, 704. Throughout 2022, Petitioner continued to follow-up with NP Vincent for post-GBS weakness, bilateral shoulder pain, and B-12 deficiencies among other issues. Id. at 708 (February 23, 2022), 762-64 (May 25, 2022); Pet. Ex. 15 at 60 (July 11, 2022), 49-55 (October 2022).

On March 21, 2022, Petitioner returned to Dr. Schmidt, "report[ing] no significant changes in symptoms associated with CIDP." Pet. Ex. 5 at 7. She experienced cycles of weakness prior to IVIG infusions, followed by illness, soreness, and nausea after the infusion, and then a period of optimal functionality before becoming weak again nearing the time of the next infusion. Id. She continued to use crutches to help her to walk, was compliant with PT and OT, and that, despite the mild adverse drug effects, she was pleased with IVIG and would like to continue it. Id. Dr. Schmidt's impression and plan were unchanged. Id. at 7-8.

Petitioner again saw Dr. Schmidt on June 22, 2022, reporting that she had not received IVIG treatment for approximately one month and was currently experiencing moderate weakness and pain, particularly in the arms, chest, and neck. Pet. Ex. 8 at 87. Her tremor was unchanged, and she had discontinued propranolol due to intolerance. Id. On examination, Dr. Schmidt documented that Petitioner walked with the assistance of forearm crutches, he noted Tinel signs[12] in the greater and lesser occipital nerves and the lumbar nerves, and trigger points were identified in the trapezii, rhomboids, serratus posterior, and supinators. Id. at 88. He added occipital neuralgia, myalgia, and lumbago with sciatica to his impressions. Id. at 89. He discussed a trial of nerve and trigger point injections with Petitioner, but she declined them. Id. He also referred Petitioner to the neuromuscular clinic at Standford University for further evaluation and treatment. Id.

---

[12] Tinel sign is "a tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." Tinel Sign, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=106510 (last visited May 11, 2026).

On September 21, 2022, Petitioner again saw Dr. Schmidt, reporting she had recently fallen due to acute leg weakness. Pet. Ex. 8 at 90. A limited neurological examination noted no abnormalities. Id. at 91. Impression remained GBS, CIDP, history of adverse drug effect to Privigen IVIG, and essential tremor. Id. The plan was to continue with Gamunex IVIG. Id.

Petitioner attended 89 PT sessions from August 20, 2019 through June 6, 2022. See Pet. Ex. 6 at 92-770. At a May 17, 2022 PT session, Petitioner reported that she was doing well, and the therapist's assessment was that she continued to demonstrate poor endurance and high fall risk due to a lack of coordination and strength. Id. at 758. At the final PT session on June 6, 2022, the therapist noted that Petitioner continued to have difficulty with coordination and single leg balance exercises due to weakness in the bilateral lower extremities, and that she frequently hyperextended her knees due to quadricep weakness. Id. at 769. Petitioner also had 59 OT sessions from October 3, 2019 through May 18, 2022. See id. at 125, 758, 769. At the most recent OT visit for which records have been provided, which occurred on May 18, 2022, Petitioner reported that she was doing better than the previous week, but still had pain in both shoulders that she rated 6/10, and the plan was to continue with weekly visits. Id. at 759. At several OT sessions and infusion treatments from 2019 to 2022, Petitioner reported that she experienced "all over" or "whole body" pain, which she rated between 3/10 and 10/10. Id. at 335, 351, 601-02, 607, 613, 637, 671, 681, 690, 712, 731, 735, 747, 757. At PT and OT, she also reported pain in other locations, including neck, shoulders, arms, forearms, hands, wrists (particularly due to crutch use), back, hips, legs, knees, ankles, and feet, as well as headaches/migraines, dizziness, and visual disturbances. See, e.g., id. at 119, 125, 130-31, 183, 186, 218, 221, 335, 345, 405, 412, 418, 472, 479, 482, 521, 526, 607, 613, 619, 656, 659, 662, 681, 735, 741, 747, 759.

### e.    2023 and 2024 Record Summary

Throughout 2023, Petitioner continued to see NP Vincent for various issues, including chronic diarrhea, abdominal and rectal pain, urinary retention, iron infusions, dizziness, weakness, gait difficulties, use of a wheelchair, and residual GBS symptoms, for which she tried switching from gabapentin to Cymbalta (duloxetine), but switched back to gabapentin. See Pet. Ex. 15 at 3-48. During this time, a swallow study, retroperitoneal ultrasound, and abdomen and pelvis CT were all unremarkable. Id. at 227-32. In 2023, Petitioner also presented to the optometrist for "several years" of "constant" blurry vision, as well as redness, dryness, watering, itchiness, and a gritty feeling, and received diagnoses of punctate keratitis, vitreous membranes and strands, and cataracts. Pet. Ex. 14 at 22-33.

On March 6, 2024, Petitioner saw Kenneth Leung, M.D., a neurologist at the neuromuscular clinic at Stanford for evaluation of CIDP.[13] Pet. Ex. 51 at 22. She reported feeling drunk and lightheaded the day after receiving her flu and pneumococcal vaccinations in August 2019. Id. She recalled that she went to urgent care, received steroids, and then experienced leg weakness and mobility impairments, at which point she went to the ED with weakness in the arms, legs, and torso and slurred speech and was "admitted to the ICU." Id. She reported that she was given IVIG and discharged with a wheelchair; she then began to

---

[13] Petitioner was referred to Dr. Leung by her neurologist, Dr. Schmidt. Pet. Ex. 51 at 51.

experienced tremors during PT, as well as bladder issues and "optic nerve damage." Id. Dr. Leung reviewed Petitioner's February 2023 brain and spine MRIs, which were unremarkable. Id. at 23, 26-27. A neurological examination showed full or near-full strength and normal reflexes throughout, but "distract[i]bility" and inconsistency in movements and tremor, as well as a subjective report of "0%" sensation of vibration in hands and feet. Id. at 25-26. Dr. Leung noted that Petitioner had been worked up for "possible GBS" "and/or questionable CIDP," but "there [were] many atypical features" that made him "question the underlying diagnosis," including the fact that "her symptoms progressed to severe arm/leg weakness and inability to ambulate" over one day, instead of days or weeks, yet "she did not require intubation;" that she had received "monthly IVIG without significant subjective improvement;" and that her examination showed "near-full or full [strength] throughout, with preserved reflexes, even though she described complete anesthesia in [her] arms/legs." Id. at 21. Dr. Leung noted there was "[a]t least a superimposed component of functional neurologic symptom disorder, given examination features [] with prominent functional overlay," including tremors that "are not consistent with reported essential tremor." Id.

Dr. Leung performed a repeat EMG/NCS on May 9, 2024, which was "normal, without electrodiagnostic evidence of polyneuropathy or demyelinating changes." Pet. Ex. 51 at 3-10. He also noted that results of labs ordered March 4 were unrevealing. Id. at 4. Dr. Leung's impression was that Petitioner's "ongoing prominent symptoms without electrodiagnostic correlate" were "not consistent with an ongoing demyelinating neuropathy such as GBS or CIDP." Id. He discussed with Petitioner his "leading diagnostic consideration of functional neurologic symptoms disorder" and provided a "referral to a local provider familiar with FND." Id.

No further records related to Petitioner's claim have been provided.

### 2.    Petitioner's Affidavit

Petitioner executed one affidavit on July 5, 2022, in support of her claim. Pet. Ex. 7. Petitioner received flu and Pneumovax-23 vaccines on August 11, 2019. Id. at ¶ 3. She averred that prior to the vaccinations she was in good health. Id. at ¶ 4. On August 12, 2019, Petitioner "began to experience numbness and weakness in both legs" and went to the ED. Id. at ¶ 5. She was then "diagnosed with possible [GBS]" and began IVIG treatments. Id. at ¶ 6. Petitioner explained that while the IVIG "helped [her] immediate symptoms," she has "continued experience peripheral neuropathy." Id. at ¶ 7. Petitioner averred she was "eventually diagnosed with [CIDP]" and, as of July 5, 2022, "continue[s] to experience symptoms to this day." Id. at ¶ 8.

16

      **C.**      **Expert Reports**[14]

      **1.**      **Petitioner's Expert, Yuval Shafrir, M.D.**[15]

      **a.**      **Background and Qualifications**

Dr. Shafrir is board-certified neurologist with a specialty in pediatric neurology, clinical neurophysiology, and epilepsy.  Pet. Ex. 17 at 1; Pet. Ex. 52 at 1-2.  He received his M.D. from Tel Aviv University, Sackler School of Medicine in Israel followed by an internship and residency rotations at hospitals in Israel.  Pet. Ex. 52 at 1.  Dr Shafrir finished his pediatric residency at North Shore University Hospital in New York.  Id.  He then completed a fellowship in pediatric neurology at Washington University Medical Center in Missouri and a second fellowship in pediatric neurophysiology and epileptology at Miami's Children's Hospital in Florida.  Id.  Dr. Shafrir is currently in private practice.  Id. at 5.  He previously served as an Assistant Professor in Neurology and Pediatrics at multiple academic and medical institutions, including most recently, Penn State College of Medicine.  Id. at 7.  In his clinical practice, Dr. Shafrir has "concentrated on autoimmune brain disorders."  Pet. Ex. 17 at 1.  He has published peer-reviewed journal articles and abstracts on the topics of pediatric neurology, epilepsy, epileptic syndromes, and neurogenetics.  Id.; Pet. Ex. 52 at 8-13.

      **b.**      **Diagnosis Opinion**

Dr. Shafrir opined that Petitioner's diagnosis was GBS with "some residual permanent disability."  Pet. Ex. 17 at 36, 44.  He further opined that a diagnosis of CIDP was "very unlikely."  Id. at 35-36.

Dr. Shafrir provided a lengthy summary of the medical records reviewed in preparation of his report.  See Pet. Ex. 17 at 1-34.  Of note, Dr. Shafrir did not review the medical records from Petitioner's March and May 2024 visits to Dr. Leung, the neuromuscular neurologist, prior to the preparation of his expert report.[16]  See id.

In providing his opinion regarding diagnosis, Dr. Shafrir explained that "the overall quality of the medical care, the diagnostic process, the medical decision-making process and the medical record" were "far from ideal" making "the establishment of the diagnosis more difficult."  Pet. Ex. 17 at 34.  He specifically noted that most neurology and follow-up visits contained no description of Petitioner's reflexes making diagnosis "more difficult."  Id.

---

[14] Although the undersigned has reviewed all the expert reports and medical literature, for the sake of brevity this Decision does not include all details of the experts' opinions.  Instead, the undersigned focuses on the experts' material opinions, as they relate to the relevant issues.

[15] Dr. Shafrir submitted one expert report.  Pet. Ex. 17.

[16] Dr. Shafrir's report is dated May 3, 2024, and it was filed May 6, 2024.  See Pet. Ex. 17 at 1.  Petitioner's records from her visits to Dr. Leung were not filed until September 11, 2024.  See Pet. Ex. 51.

Regardless, Dr. Shafrir opined "that the diagnosis of demyelinating polyneuropathy is well-established."  Id.

Dr. Shafrir explained that "24 hours" after vaccination, Petitioner "developed ascending numbness in gloves and stocking distribution and severe lower extremity weakness that prevented her from walking.  With it, she also had balance problem[s] and bladder dysfunction.  This led to her admission to the hospital where a diagnosis of [GBS] was made."  Pet. Ex. 17 at 34.

Reviewing Petitioner's August 2019 CSF results, August 2019 MRI findings, and November 21, 2019 EMG/NCS testing, Dr. Shafrir agreed that none of these tests were "diagnostic for demyelinating neuropathy."  Pet. Ex. 17 at 34.  Dr. Shafrir observed Petitioner's "initial severe deficit occurred very quickly" and he asserted this rapid clinical course explained why these tests were not diagnostic of GBS.  Id.  Additionally, Dr. Shafrir explained that normal CSF protein level does not rule out GBS as CSF protein remains normal in 10% of patients with GBS.  Id. (citing Pet. Ex. 18).[17]  Additionally, CSF protein levels may not rise for one to two weeks after the onset of weakness in GBS.  Id.; see also Pet. Ex. 19 at 6 (noting a "diagnostic sensitivity of CSF total protein within the first week of disease onset of approximately 50% to 70%").[18]

Regarding FND (the diagnosis proposed by Respondent's expert), Dr. Shafrir acknowledged that Petitioner's "initial presentation with inability to move the feet and inconsistent sensory examination raised the possibility of a functional disorder."  Pet. Ex. 17 at 34.  However, Dr. Shafrir opined that "persistence of the neurological deficits" and "the documentation of typical presentation of demyelinating polyneuropathy with absence of reflexes (documented once by the neurologist) and gloves and stockings sensory deficit" were supportive of an acquired demyelinating neuropathy.  Id.  Dr. Shafrir highlighted that Petitioner's treating neurologist, Dr. Schmidt, documented absent reflexes as well as "[d]ecreased temperature sensation in the distal upper extremities up to the wrists and in the distal lower extremities to calves[,] [d]ecreased vibration and light touch[] sensation at the wrists[,] and distal lower extremities bilaterally."  Id. at 35.  Dr. Shafrir opined this November 2019 examination "establishe[d] the diagnosis of demyelinating polyneuropathy versus 'hysteria' [i.e. FND]," although the initial lumbar puncture was negative and MRI did not show enhancement changes consistent with GBS as "the lumbar nerve roots and cauda equina did not enhance."  Id.

Next, Dr. Shafrir explained why Petitioner's demyelinating polyneuropathy diagnosis was more consistent with GBS than CIDP.  Pet. Ex. 17 at 34-36.  First, Dr. Shafrir opined GBS and CIDP are mutually exclusive diagnosis.  Id.  Next, he explained that Petitioner did not meet the diagnostic criteria for CIDP which require a "chronically progressive" clinical course.  Id. at

---

[17] Michael T. Andary, Guillain-Barre Syndrome, Medscape, https://emedicine.medscape.com/article/315632 (last updated Jan. 14, 2022).

[18] Harald Hegen et al., Cerebrospinal Fluid Protein in Guillain–Barré Syndrome: Need for Age-Dependent Interpretation, 28 Eur. J. Neurol. 965 (2021).

35 (citing Pet. Ex. 21).[19]  Dr. Shafrir observed that Petitioner "never got any worse" in the three months between being discharged from the hospital and her first follow-up visit with Dr. Schmidt.  Id.  Next, Petitioner's November 2019 EMG/NCS did not meet the diagnostic criteria for CIDP.  Id.  Further, Petitioner had voiding dysfunction which Dr. Shafrir opined was a common complication of GBS but not typically present in CIDP.  Id.  Finally, he noted that Petitioner's PCP, occupational therapist, and physical therapists "only use the term [GBS] and do not mention CIDP."  Id. at 36.

Dr. Shafrir concluded that Petitioner's diagnosis is GBS and not CIDP and he attributed Petitioner's "ongoing difficulties" to persistent residual deficits resulting from her acute illness."  Pet. Ex. 17 at 36.

### c.    Causation Opinion

### i.    Althen Prong One

Dr. Shafrir opined vaccinations are a "well-known trigger" for GBS.  Pet. Ex. 17 at 36; see, e.g., Pet. Ex. 25 at 2 (noting infection, immunization, or surgery "often precedes neurological symptoms [of GBS] by [five] days to [three] weeks").[20]

Dr. Shafrir opined that flu vaccine is "one of the few cases in which the association and likely causative relationship between a vaccine and a neurological illness is well demonstrated by epidemiological studies."  Pet. Ex. 17 at 37.  He explained an association had been demonstrated between the 1976 swine flu vaccine and GBS.  Id. (citing Pet. Ex. 37).[21]  Dr. Shafrir further noted that a small increased risk of GBS was also demonstrated in later flu vaccination seasons.  Id. (citing Pet. Ex. 39;[22] Pet. Ex. 40).[23]  A study from Polakowski et al. described an increased risk of GBS following the 2009 H1N1 flu vaccine.  Pet. Ex. 40 at 1.

---

[19] R.A.C. Hughes et al., European Federation of Neurological Societies/Peripheral Nerve Society Guideline on Management of Chronic Inflammatory Demyelinating Polyradiculoneuropathy: Report of a Joint Task Force of the European Federation of Neurological Societies and the Peripheral Nerve Society, 13 Eur. J. Neurol. 326 (2006).

[20] Dale J. Lange et al., Acquired Neuropathies, in Merritt's Neurology 15 (10th ed. 2000).

[21] Lawerence Schonberger et al., Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977, 110 Am. J. Epidemiol. 105 (1979).

[22] David Juurlink et al., Guillain-Barre Syndrome After Influenza Vaccination in Adults: A Population-Based Study, 166 Arch. Intern. Med. 2217 (2006).

[23] Laura L. Polakowski et al., Chart-Confirmed Guillain-Barré Syndrome After 2009 H1N1 Influenza Vaccination Among the Medicare Population, 2009–2010, 178 Am. J. Epidemiol. 962 (2013).

Another study by Juurlink et al. found an increased risk of GBS following flu vaccine using a case-series method and cohort of patients admitted to the hospital between 1992 and 2004; however, the authors also conducted a time-series analysis that demonstrated "no evidence of seasonality and revealed no statistically significant increase in hospital admissions because of GBS" following the implementation of a universal flu vaccination in Canada in 2000.  Pet. Ex. 39 at 1.  In addition to epidemiological studies, Dr. Shafrir noted that both the Advisory Committee on Immunization Practices and recent flu package inserts issue warnings for patients with a history of GBS.  Pet. Ex. 17 at 37-38.

Addressing the causal mechanism, Dr. Shafrir first acknowledged molecular mimicry[24] as a "major mechanism for the causation of [GBS] by vaccination."  Pet. Ex. 17 at 37 (citing Pet. Ex. 29).[25]  However, Dr. Shafrir also opined that molecular mimicry is not the only mechanism of GBS.  Id.

Quoting Israeli et al., Dr. Shafrir noted "GBS is commonly seen in association with other autoimmune diseases, changes in T cells subclasses, and change in cytokine profile."  Pet. Ex. 17 at 37 (quoting Pet. Ex. 29 at 2).  Accordingly, Dr. Shafrir proposed a role for the innate immune system and cytokines in the pathogenesis of vaccine-induced GBS.  Id.; see also Pet. Ex. 30 at 1 (discussing "current knowledge" of the role of specific cytokines in GBS);[26] Pet. Ex. 31 at 1 (suggesting "inflammatory cytokines are important mediators for the onset and progression of GBS");[27] Pet. Ex. 32 at 8-9 (discussing the role of proinflammatory cytokines in GBS).[28]

---

[24] Molecular mimicry is "a model of autoimmunity in which an immune response to a foreign antigen containing a peptide region that mimics a self epitope provokes cross-reactivity to a self protein.  [GBS] . . . [is an] example[] of [a] condition[] caused by this process."  Molecular Mimicry, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/ definition? id=89392 (last visited May 21, 2026); see also Rowan v. Sec'y of Health & Hum. Servs., No. 17-760V, 2020 WL 2954954, at *18 n.17 (Fed. Cl. Spec. Mstr. Apr. 28, 2020) ("GBS is understood to be mediated by an autoimmune process that is attributable to the erroneous functioning of the adaptive immune system.  Antibodies produced by B cells as part of the adaptive response to the antigens presented (whether through foreign infection or here, vaccine) attack the myelin sheath of peripheral nerves.").

[25] Eitan Israeli et al., Guillain-Barre Syndrome – A Classical Autoimmune Disease Triggered by Infection or Vaccination, 42 Clin. Rev. Allerg. Immunol. 121 (2012).

[26] Ming-Ou Lu & Jie Zhu, The Role of Cytokines in Guilian-Barre Syndrome, 285 J. Neurol. 533 (2011).

[27] Ting Sun et al., Peripheral Blood and Cerebrospinal Fluid Cytokine Levels in Guillain Barré Syndrome: A Systematic Review and Meta-Analysis, 13 Front. Neurosci. 717 (2019).

[28] Zahra Ebrahim Soltani et al., Autoimmunity and Cytokines in Guillain-Barré Syndrome Revisited: Review of Pathomechanisms with an Eye on Therapeutic Options, 30 Eur. Cytokine Netw. 1 (2019).

Additionally, Dr. Shafrir opined that the therapeutic response to IVIG supports the role of cytokines in GBS pathogenesis.  Pet. Ex. 17 at 37.

Dr. Shafrir explained that an increase in proinflammatory cytokines occurs following the receipt of flu vaccine and further opined that "dramatic interindividual variability in cytokines response" could occur following vaccination.  Pet. Ex. 17 at 42.  In support, Dr. Shafrir cited a study by Talaat et al.[29] that observed the cytokine responses in intervals from three hours to 14 days in 20 healthy recipients following a flu vaccine.  Id. (citing Pet. Ex. 47).  The authors found that serum cytokines (including interleukin ("IL")-6, IL-2, IL-8, IP-10, monocyte chemotactic protein ("MCP")-1, tumor necrosis factor ("TNF")-α, thymus and activation-regulated chemokine, and MCP-4) changed rapidly following a flu vaccine and peaked at 24 hours.  Pet. Ex. 47 at 1.  One subject had an outlier response that coincided with "only moderate side effects to the vaccine."  Id.  The authors concluded their study "suggest[ed] that early cytokine/chemokine responses may provide additional insight into the pathogenesis of adverse events."  Id.

Dr. Shafir suggested that Petitioner experienced an abnormal cytokine response to the flu vaccine resulting in GBS.  Pet. Ex. 17 at 41, 44.  However, his opinion is not robust in that he simply provided a conclusory statement that "exaggerated cytokines . . . produced an increase in inflammatory activity in [Petitioner's] nerve roots and peripheral nerves and caused [GBS]."  Id. at 44.

While the articles relied on by Dr. Shafrir discuss cytokines and the role they play in the pathogenesis of GBS, GBS is generally understood to be an autoimmune process involving molecular mimicry, and the role of cytokines is discussed in that context.  See Pet. Exs. 30-32.  For example, Lu and Zhu explained that two-thirds of GBS cases are thought to be a "post-infectious autoimmune disease that may involve molecular mimicry triggered by many [different] antecedent pathogens."  Pet. Ex. 30 at 1.  Further, the authors opined that the different types of GBS are "probably due to the diverse interplay between antibodies and T cells of differing specificities."  Id.  Thus, the authors stated that GBS is an autoimmune disease, and the mechanism is thought to be molecular mimicry, involving antibodies and T cells.  See id.  The discussion about cytokines occurs within this context, and cytokines are not presented as an independent mechanism of causation.  See id.  The authors explained that cytokines "act as signal molecules . . . between the cells of the immune system" and are important in "initiating, propagating and regulating tissue specific autoimmune injury."  Id. at 1-2.  Further, cytokines also have protective and beneficial roles, and are important in neuroprotection and regeneration, although these mechanisms are not understood.  Id. at 10.

Next, Sun et al. conducted a literature review regarding cytokines and GBS, and reported that certain cytokines (Th-1, Th-2, and Th-17) were elevated in patients with GBS.  Pet. Ex. 31 at 1, 6.  The authors further noted that "infiltrating T cell-produced TNF-alpha has a direct myelinotoxic effect . . . which leads to demyelination in nerve cells . . . and . . . can also affect

---

[29] Kawsar R. Talaat et al., Rapid Changes in Serum Cytokines and Chemokines in Response to Inactivated Influenza Vaccination, 12 Influenza Other Resp. Viruses 202 (2018).

the synthesis of myelin protein." Id. at 5-6. They concluded that these elevated cytokines "have potential to be used as biomarkers" to add in diagnosis and treatment of the disease. Id. at 6. They did not conclude that cytokines constituted a mechanism that induced GBS. See id.

Finally, Soltani et al. go into significant detail about the role of cytokines in GBS, especially proinflammatory cytokines, which may disrupt "disrupt the blood-nerve barrier, alter its immune active phenotypes, increase its permeability, and promote T cell infiltration. The proinflammatory milieu prepare the ground for circulating anti-myeline autoantibodies to enter the neural [sheath], leading to focal demyelination." Pet. Ex. 32 at 8. While cytokines are important to the pathogenesis of GBS, the illness is thought to be caused by molecular mimicry, an adaptive immune mechanism and not an innate immune response. See id. at 1, 3, 8.

Because IVIG is the first line treatment of GBS, Dr. Shafrir argued that its effectiveness illustrated the role of cytokines in the pathogenesis of GBS. Pet. Ex. 17 at 37. As explained by Wong and White,[30] IVIG is thought to be an effective treatment of GBS because it "[n]eutralizes bacterial trigger[s]," "[p]rovides anti-idiotypic antibodies," "[i]nhibits complement -mediated myelin destruction," "[d]ownregulates inflammatory cytokines," "[p]romotes remyelination," and "[d]ownregulates B cell activation and antibody production." Pet. Ex. 34 at 3 tbl. 1.[31]

Dr. Shafrir's statements attributing causation to cytokines in a conclusory manner ignore the complex pathogenesis of GBS, and the roles cytokines play within the broader context of the adaptive immune system. Confusingly, Dr. Shafrir also opined that "mechanisms by which [flu] vaccine causes GBS" are "completely unknown." Pet. Ex. 17 at 38. And Dr. Shafrir added that "there is no well proven mechanism" for GBS following flu vaccination. Id. at 37-38.

Dr. Shafrir concluded vaccination can cause GBS "through activation and autoimmune or auto inflammatory reactions of both innate and adaptive components of the immune system, and is likely to be related to genetic factors which determine the intensity of the immune reaction and the propensity for autoimmunity." Pet. Ex. 17 at 43.

### ii.    Althen Prongs Two and Three

Addressing Althen prong two, Dr. Shafrir opined that there was "a logical sequence of cause and effect showing vaccination was the reason for injury." Pet. Ex. 17 at 43-44. Dr. Shafrir explained that due to "inherent dysregulation" of Petitioner's innate immune system, the flu vaccine produced "an abnormal activation of the innate immune system, which probably included exaggerated cytokines in response to the [flu] vaccination. This produced an increase

---

[30] Priscilla H. Wong & Kevin M. White, Impact of Immunoglobulin in Pediatric Disease: A Review of Immune Mechanisms, 51 Clin. Rev. Allerg. Immunol. 303 (2016).

[31] For further discussion of the mechanisms of action of IVIG, see generally Pet. Ex. 33 (J.P. Andersson & U.G. Andersson, Human Intravenous Immunoglobulin Modulates Monokine Production In Vitro, 71 Immunology 372 (1990)); Pet. Ex. 34; Pet. Ex. 35 (Jagadeesh Bayry et al., Intravenous Immunoglobulin: Mechanism of Action in Autoimmune and Inflammatory Conditions, 11 J. Allergy Clin. & Immunol. 1688 (2023)).

in inflammatory activity in her nerve roots and peripheral nerves, and caused [GBS]." Id. at 44. Dr. Shafrir also noted that no other cause had been found for Petitioner's GBS. Id.

Addressing Althen prong three, Dr. Shafir acknowledged that Petitioner's symptom onset occurred one day after vaccination. Pet. Ex. 17 at 38. He agreed that a one-day onset "may raise questions about the biological feasibility and the possible mechanisms by which the vaccine could cause her illness." Id. However, Dr. Shafrir concluded "the short interval between the vaccination and the onset of [GBS] in [Petitioner] is compatible with the current knowledge in the field." Id. at 44. Dr. Shafrir offered two explanations for this "short time interval." Id. at 40-43.

Dr. Shafrir's first explanation is based on a secondary anamnestic response (an adaptive immune response) which he asserted peaks in one to three days. Pet. Ex. 17 at 40 (citing Pet. Ex. 45).[32] According to Kaiser, a primary immune response to a new antigen[33] will produce antibodies beginning about five days after exposure, with peak production of antibodies at approximately 10 days. Pet. Ex. 45 at 1, fig. 13.1F.2. Subsequent exposure to the same antigen will elicit a faster response with a "more rapid production of antibodies." Id. This "secondary response" peaks in one to three days. Id. Dr. Shafrir did not cite to records or evidence showing that Petitioner previously received the same or similar flu vaccine as the one she received August 11, 2019. See Pet. Ex. 17 at 2-4, 38-42. However, Petitioner's filed medical records show she received flu vaccinations in 2014 and 2018. See Pet. Ex. 12 at 1; Pet. Ex. 2 at 4. Without foundational evidence showing that Petitioner had a primary exposure to the same antigens, there is no evidence to support a secondary response.

In support of his explanation based on a secondary immune response, Dr. Shafrir cited a study by Claeys et al., which compared the secondary immune response of children who received a primary vaccination series (primed) with those who had not (unprimed). Pet. Ex. 17 at 41 (citing Pet. Ex. 46). Relevant here, the study showed that the "immune response [seven] days after the booster dose was higher than the immune response after the first dose in [flu] vaccine

---

[32] Gary Kaiser, Anamnestic (Memory) Response, Libretexts, https://batch.libretexts.org/print// url=https://bio.libretexts.org/Bookshelves/Microbiology/Microbiology_(Kaiser)/Unit_6%3A_Ad aptive_Immunity/13%3A_Humoral_Immunity/13.1%3A_Antibodies_(Immunoglobulins)/13.1F %3A_Anamnestic_(Memory)_Response.pdf (last accessed June 20, 2024). The Kaiser article appears to be self-published course material. See id.

[33] Dr. Shafrir's first explanation regarding antigen response relates to the adaptive immune system and development of antibodies, not his theory relative to cytokines. See, e.g., Pet. Ex. 46 at 1 (Carine Claeys et al., Anamnestic Immune Response and Safety of an Inactivated Quadrivalent Influenza Vaccine in Primed Versus Vaccine-Naïve Children, 38 Pediatr. Infect. Dis. J. 203 (2019) ("The primary objective was to evaluate [ ] antibody titers [seven] days after [] vaccination.")); see also Brancheau v. Sec'y of Health & Hum. Servs., No. 21-1209V, 2024 WL 1619606, at *24 (Fed. Cl. Spec. Mstr. Mar. 21, 2024) (discussing the role of antigens in the adaptive immune response).

naïve children." Pet. Ex. 46 at 6. Dr. Shafrir did not explain how an increased immune response at seven days supported his opinion that a one-day onset is appropriate. See Pet. Ex. 17 at 41.

Dr. Shafrir's second and "more likely" explanation of how a one-day onset can occur is based on his cytokine theory and innate immune response. Pet. Ex. 17 at 41. He opined that proinflammatory cytokines increase "within hours" of an antigen stimulant via the flu vaccine and "produce a cascade of multiple immune and inflammatory reactions, the results of which can take days to appear." Id. (citing Pet. Ex. 48).[34] Kany et al. discussed the biology of six different cytokines and their role as inflammatory mediators in shock, immune dysregulation, osteoporosis, and critical illnesses. Pet. Ex. 48 at 1. They discussed the role of IL-6 in the adaptive immune response (i.e., promoting T-cell differentiation), but they did not suggest it played a role in triggering GBS or other demyelinating illnesses. Id. at 3.

In support of his opinion related to cytokines, Dr. Shafrir cited several articles. See Pet. Exs. 47-50.[35] As discussed above, Talaat et al. found that certain cytokine levels peaked at 24 hours. Pet. Ex. 47 at 1. There was one subject whose cytokine levels were "distinctive" and showed an "early cytokine response profile." Id. The study participants reported mild to moderate post-vaccination myalgia and/or injection site pain with an onset five to six hours after vaccination and mean duration of 20 to 21 hours. Id. at 5. There were also reports of mild shortness of breath, sore throat, and vomiting. Id. These adverse reactions were limited in duration. Id. The reactions attributed to cytokines included systemic side effects such as fever and myalgia, and local reactions like injection site pain. Id. at 5, 9. The authors did not study or discuss the role cytokines played in GBS.

The next paper referenced by Dr. Shafrir was authored by Christian et al.[36] and it described a study of the associations between proinflammatory cytokines and subjective side effects after receipt of the flu vaccination in pregnant and non-pregnant women. Pet. Ex. 49 at 1. The study showed a transient increase in some cytokines after vaccination, and these increases were associated with subjective symptoms such as arm soreness, headache, sleepiness, nausea, sore throat, mild fever, and achiness. Id. The authors advised that such symptoms "may be related to normal mild inflammatory responses to the vaccine." Id. There was no discussion related to the role of cytokines in GBS.

---

[34] Shinwan Kany et al., Cytokines in Inflammatory Disease, 20 Int. J. Mol. Sci. 6008 (2019).

[35] Dr. Shafrir cited a study by Jolink et al, where the flu vaccination was used as an inflammatory stimulus to assess its effect on social behavior, especially social withdrawal. Pet. Ex. 50 (Tatum A. Jolink et al., Inflammatory Reactivity to the Influenza Vaccine Is Associated with Changes in Automatic Social Behavior, 99 Brain Behav. Immun. 339 (2022)). This paper does not appear to be relevant to the issues in dispute and is not discussed.

[36] Lisa M. Christian et al., Proinflammatory Cytokine Response Correspond with Subjective Side Effects After Influenza Virus Vaccination, 33 Vaccine 3360 (2015).

Additionally, Dr. Shafrir discussed case reports of GBS occurring within two days after various vaccinations. Pet. Ex. 17 at 38-40. He noted Schonberger et al. documented approximately 10 cases of GBS with onset between zero and one day of the 1976 swine flu vaccine and Polakowski et al. reported one case of GBS with onset one day after the 2009 H1N1 vaccine. Id. (citing Pet. Ex. 37 at 8 fig. 5; Pet. Ex. 40 at 6 fig. 2). And a review of GBS following Covid-19 vaccinations described two cases of GBS with a one-day onset. Id. at 40 (citing Pet. Ex. 44 at 5 fig. A).[37]

Other literature referenced by Dr. Shafrir does not support an onset of one day following immunization. For example, Ropper et al.[38] provided a summary describing what is known about the pathogenesis of GBS, and described antigen antibody reactions, antimyelin antibodies, and complement dependent myelin damage, but they did not discuss cytokine-induced inflammation and offered no support for a one-day onset. Pet. Ex. 24 at 6-7. Lange et al. stated that "[v]iral respiratory of gastrointestinal infection, immunization, or surgery often precedes neurologic symptoms by [five] days to [three] weeks." Pet. Ex. 25 at 2. Israeli et al. stated that the period between vaccination and onset of GBS ranged from "as short as [three to five] days, to [six to ten] weeks." Pet. Ex. 29 at 4. Finally, a study by Schessl et al.[39] identified eight children who developed GBS following vaccinations. Pet. Ex. 28 at 1. Patient number eight had a one-day onset. Id. at 5 tbl. 4. The authors specifically concluded that in patient eight "the time between the vaccination and onset of GBS was too short to warrant a causal relationship." Id. at 4. Patient eight was also noted to have an upper respiratory tract infection within six weeks prior to onset of GBS. Id.

### 2.    Respondent's Expert, Collin Kreple, M.D., Ph.D.[40]

#### a.    Background and Qualifications

Dr. Kreple is a board-certified neurologist with additional certifications in neuromuscular medicine and electrodiagnostic medicine. Resp. Ex. B at 1. He received his M.D. and his Ph.D. in molecular physiology and biophysics from the University of Iowa and subsequently completed a neurology residency at the University of California, San Francisco and a neuromuscular medicine fellowship at Washington University in Missouri. Id. Dr. Kreple currently serves as Assistant Professor of Neurology at the University of Wisconsin. Id.; Resp. Ex. A at 1. In his clinical practice, Dr. Kreple has "diagnosed and treated many patients with GBS (100+) and CIDP (75+)." Resp. Ex. A at 1. His research is focused on "on the topics of ion channel

---

[37] Kayla E. Hanson et al., Incidence of Guillain-Barré Syndrome After COVID-19 Vaccination in the Vaccine Safety Datalink, 5 JAMA Netw. Open. E228879 (2022).

[38] Allan Ropper et al., Syndrome of Acute Motor Paralysis with Variable Disturbance of Sensory and Automatic Function, in Adams and Victor's Principles of Neurology 1322 (10th ed. 2014).

[39] Joachim Schessl et al., Infections and Vaccinations Preceding Childhood Guillain-Barré Syndrome: A Prospective Study, 165 Eur. J. Pediatr. 605 (2006).

[40] Dr. Kreple filed one expert report. Resp. Ex. A.

physiology, pain, amyotrophic lateral sclerosis, seizure physiology, and autoimmune/infectious diseases of the nervous system" and Dr. Kreple has published 14 peer-reviewed articles on these topics.  Id.; Resp. Ex. B at 4-6.

### b.    Diagnosis Opinion

Dr. Kreple opined Petitioner "more likely than not . . . was suffering from FND rather than GBS."  Resp. Ex. A at 12.  He further opined that Petitioner had a "very typical presentation for FND."  Id. at 11.  Additionally, Dr. Kreple agreed with Dr. Shafrir that "there [was] no meaningful evidence to suggest a diagnosis of CIDP."  Id. at 10 (citing Pet. Ex. 17 at 35-36).

### i.    Functional Neurological Disorder

"FND is a psychiatric illness characterized by signs and symptoms associated with sensory and/or motor dysfunction inconsistent with patterns of known neurologic diseases."  Resp. Ex. A at 7.  FND was previously known as conversion disorder, however, as Dr. Kreple explained, this terminology has "fallen out of favor."  Id. at 7, 12.  Dr. Kreple noted that FNDs "can significantly impact the ability to function independently and are a common cause of disability."  Id. at 7.  FND can occur in any age group and most commonly occurs in women.  Id. (citing Resp. Ex. A-8).[41]

Dr. Kreple explained FNDs may include "inconsistencies in physical exam and disruption of normal gait, with features such as slowness, excessive demonstration of effort, and knee buckling."  Resp. Ex. A at 8 (citing Resp. Ex. A-4).[42]  FND weakness tends to have a sudden or acute onset that "can affect any part of the body" and is associated with significant fatigue.  Id.  Sensory changes may include midline splitting, which Dr. Kreple described as "a prominent change in sensation sensitivity at the body's midline," "a subjective loss of sensation in exactly half the body," and "a non-physiologic finding."  Id. at 7-8.  Relying on Varley et al.,[43] Dr. Kreple explained midline splitting is highly specific (88% to 100%) for FND.  Id. at 8 (citing Resp. Ex. A-10).

In a review of medical literature by Varley et al., the authors described one study that found midline splitting to be "highly reliable sign" of FND.  Resp. Ex. A-10 at 3.  The study found midline splitting to have "100% specificity and 42% sensitivity" for FND and splitting of vibration sense to have "88% specificity and 50% sensitivity" for FND.  Id. at 4 tbl. 1; see also

---

[41] John Stone et al., The Symptom of Functional Weakness: A Controlled Study of 107 Patients, 133 Brain 1537 (2010).

[42] Alberto Espy et al., Current Concepts in Diagnosis and Treatment of Functional Neurological Disorders, 75 JAMA Neurol. 1132 (2018).

[43] Danielle Varley et al., The Clinical Management of Functional Neurological Disorder: A Scoping Review of Literature, 165 J. Psychosom. Rsch. 111121 (2023).

Resp. Ex. A-8 at 3 (describing "midline splitting of sensory modalities (sharp demarcation of light touch, temperature at the midline" as a positive sign of FND).

To support a diagnosis of FND for Petitioner, Dr. Kreple first noted that Petitioner's treating neurologists considered conversion disorder (i.e., FND) during her initial hospitalization and treatment. Resp. Ex. A at 8-9, 12; see also Pet. Ex. 5 at 29-31 ("The patient may be suffering a conversion reaction."); Pet. Ex. 6 at 83. In 2024, Petitioner was seen by Dr. Leung, a neuromuscular neurologist, who "expressed concern" for FND. Resp. Ex. A at 10; see Pet. Ex. 51 at 21-26 ("At least superimposed component of functional neurologic symptom disorder given examination features . . . with prominent functional overlay."). Dr. Kreple explained that both GBS and CIDP are typically managed by neuromuscular neurologists, and he opined that neuromuscular neurologists are the "subspecialist who would best be able to discern between GBS/CIDP and FND." Resp. Ex. A at 10, 12.

Next, Dr. Kreple explained that Petitioner's clinical presentation was "far more consistent with FND than something like GBS." Resp. Ex. A at 12. First, Dr. Kreple observed that Petitioner had inconsistency in examinations. Id. For example, a consult note from neurologist Dr. Schmidt on August 13, 2019 described "inconsistent" examination findings with "nonphysiological" sensory deficits. Id. at 8 (citing Pet. Ex. 5 at 29-31). At the same visit, Dr. Schmidt noted midline splitting, which Dr. Kreple again opined was a highly specific finding for FND. Id. at 8, 12.

Other signs of FND included "discordance" between Petitioner's strength testing and her ability to ambulate; a gait pattern that was "not associated with neurologic dysfunction and demonstrative of excessive effort;" and "knee buckling." Resp. Ex. A at 12 (citing Resp. Ex. A-4). For example, Petitioner's PT records from August 20, 2019 include a gait examination description that Dr. Kreple opined was "not consistent with physiologic weakness but rather with an exaggerated gait that one sees with FND." Id. at 9 (citing Pet. Ex. 6 at 97 (noting Petitioner was "pressing legs excessively in a posterior direction forward center of mass, supporting significant weight on walker")). The same visit noted Petitioner needed minimal assistance to ambulate while Petitioner's confrontation strength testing showed "some muscle groups in the lower extremity unable to move against gravity" with Medical Research Council ("MRC")[44] scores of two or three. Id. at 3, 9. Dr. Kreple opined that "[t]his discordance between ease of ambulation and degree of weakness on confrontational strength testing" was consistent with FND. Id. at 9.

Additionally, Petitioner had a sudden onset of weakness following her dexamethasone injection, which Dr. Kreple opined was consistent with FND. Resp. Ex. A at 12 (citing Resp.

---

[44] "The Medical Research Council grading system is one of the most widely used clinical tools for grading muscle strength." Zacharia Isaac, Physical Therapy, Merck Manual, https://www.merckmanuals.com/professional/special-subjects/rehabilitation/physical-therapy-pt (last visited May 27, 2026). It uses a scale of zero to five, with a score of two indicating "[a]ctive movement with gravity eliminated" and a score of three indicating "[a]ctive movement against gravity but not resistance." Id.

Ex. A-4).  Finally, Dr. Kreple noted that Petitioner was "an elevated risk for FND given her sex and history of anxiety and panic disorders."  Id. (citing Resp. Ex. A-4; Resp. Ex. A-8).

Dr. Kreple concluded that "it is more likely than not" that Petitioner was suffering from FND rather than GBS.  Resp. Ex. A at 12.

### ii.       Guillain-Barré Syndrome

Dr. Kreple described GBS as "an acute, immune-mediated disease that, like CIDP, affects the spinal nerve roots and peripheral nerves."  Resp. Ex. A at 7.  Relying on the Brighton diagnostic criteria, Dr. Kreple explained GBS is characterized by "bilateral and flaccid weakness of limbs, decreased or absent deep tendon reflexes in weak limbs, monophasic course and time from onset to nadir between 12 and 28 days, CSF white cell count less than 50/microliter, elevated CSF protein, [NCS] consistent with GBS, and absence of a compelling alternative diagnosis."  Id. (citing Resp. Ex. A-5).[45]  Citing to Fokke et al., Dr. Kreple explained that GBS patients with weak limbs "almost always exhibit diminished reflexes."  Id. (citing Resp. Ex. A-5).

Using data from 494 adult patients with GBS, a study by Fokke et al. described "the variation in key diagnostic features" of adults in GBS.  Resp. Ex. A-5 at 1-2.  Looking at reflexes, the authors observed that, at study entry, 36 patients (9%) had normal reflexes in paretic limbs (arms and legs).  Id. at 5.  "These patients usually had a relatively mild weakness . . . compared to the patients with decreased reflexes . . . .  Patients with initially normal reflexes also less frequently had sensory deficits (46%) compared to patients with decreased reflexes (69%)."  Id.  All patients later developed hyporeflexia in the legs.  Id.  Specific to the leg weakness, 2% of patients had "normal tendon reflexes in weak legs" at entry to the study and no patient had "normal tendon reflexes in weak legs" at the nadir of their symptoms.  Id. at 6 tbl. 5.  While 9% of patients had "normal tendon reflexes in weak arms" at entry to the study, 2% of patients had "normal tendon reflexes in weak arms" at the nadir of their symptoms.  Id.  Looking at electrophysiological evidence, Fokke et al. found 1% of GBS patients had normal NCS results, 48% had demyelinating results, 6% had axonal results, 4% had inexcitable results, and 41% had equivocal results.[46]  Id.

Looking at Petitioner's clinical course, Dr. Kreple first noted that Petitioner's neurological examination on August 13, 2019 (two days after vaccination and one day after the onset of weakness) documented normal reflexes in weak limbs.  Resp. Ex. A at 10-11.  And normal reflexes were documented in subsequent examinations between August 13 and August 16, 2019.  Id. at 9, 11.  Dr. Kreple explained that this finding "is almost never seen in GBS, as weakness is accompanied by diminished or absent reflexes."  Id. at 8 (citing Resp. Ex. A-5).  As

---

[45] Christiaan Fokke et al., Diagnosis of Guillain-Barré Syndrome and Validation of the Brighton Criteria, 137 Brain 33 (2014).

[46] "A subgroup of 180 (41%) patients showed an abnormal nerve electrophysiology compatible with peripheral nerve (root) involvement, but did not fulfil the criteria for one of the distinct subtypes (demyelinating, axonal, or inexcitable)."  Resp. Ex. A-5 at 7.

discussed above, Fokke et al. found only 2% of patients had lower extremity weakness accompanied by normal lower extremity reflexes at or around symptom onset (entry of study). Id. (citing Resp. Ex. A-5).

Dr. Kreple acknowledged that Petitioner's neurologist documented an absence of reflexes at her November 26, 2019 examination.[47]  Resp. Ex. A at 10.  However, Dr. Kreple disagreed with Dr. Shafir's assertion that this constituted "evidence of GBS."  Id.  Dr. Kreple noted that absent reflexes were not documented until three months after vaccination, and he explained this was not consistent with areflexia due to GBS.  Id. at 9-10.  First, GBS typically reaches nadir within 28 days of onset.  Id. at 10.  Next, he explained that GBS would "cause areflexia when the patient was at their weakest in the hospital."  Id. at 9.  Petitioner had normal reflexes during her hospitalization.  Id. at 10.  Accordingly, Dr. Kreple disagreed with "anchoring a diagnostic opinion [of GBS] on a single documented instance of abnormal reflexes."  Id.

Next, Dr. Kreple opined that Petitioner's electrodiagnostic testing "confirm[ed] she never had GBS."[48]  Resp. Ex. A at 10.  In his review of the medical records, Dr. Kreple opined that the November 21, 2019 EMG/NCS "showed no evidence of a polyneuropathy, either axonal or demyelinating[,] and thus shows no evidence consistent with GBS or CIDP."  Id. at 4 (citing Pet. Ex. 16 at 6-8).  Instead, the November 2019 EMG/NCS showed "evidence of a right-sided peroneal neuropathy likely localized to the fibular head (an entrapment neuropathy)."  Id.  He explained that an "entrapment neuropathy at the peroneal nerve . . . has no relation to GBS or even CIDP."  Id. at 12.  Petitioner reported "persistent symptoms" at the time of the November 2019 EMG/NCS.  Id. at 9.  Dr. Kreple opined that "in people who have suffered from GBS and have fixed deficits even after recovery (and thus persistent symptoms), their EMG/NCS should show evidence of polyneuropathy."  Id. (citing Resp. Ex. A-6).[49]  Petitioner's second EMG/NCS, conducted May 9, 2024, also showed no evidence of a polyneuropathy "in the setting of persistent symptoms."  Id. at 12.  Dr. Kreple asserted that EMG/NCS testing showing no evidence of a polyneuropathy despite having persistent symptoms "argues strongly against . . . [P]etitioner having suffered from GBS."  Id. at 9.

Dr. Kreple identified several other aspects of Petitioner's clinical course that argued against a diagnosis of GBS.  First, he noted Petitioner developed intermittent double vision, difficulty with urinating, and a tremor.  Resp. Ex. A at 10.  Dr. Kreple opined that "[d]eveloping these symptoms months after the onset of the other symptoms is not at all consistent with GBS."  Id.  Next, Dr. Kreple noted that a one-day response to IVIG experienced by Petitioner would be

---

[47] Of note, Petitioner's neurologist, Dr. Schmidt, does not document reflex testing (normal or absent) for any subsequent visits.  See Resp. Ex. A at 10.

[48] In offering this opinion, Dr. Kreple emphasized that he is board-certified in neuromuscular medicine with "experience in administering and interpreting electrodiagnostic studies."  Resp. Ex. A at 10.

[49] Charlotte Dornonville de la Cour & Johannes Jakobsen, Residual Neuropathy in Long-Term Population-Based Follow-Up of Guillain-Barré Syndrome, 64 Neurology 246 (2005).

"highly unusual" in the context of GBS.  Id. at 11 (citing Resp. Ex. A-9 at 1 (finding a median response time to IVIG of 27 days in patients with GBS)).[50]  Finally, Dr. Kreple noted that Petitioner's MRI and CSF protein levels were normal and argued these normal tests provided evidence against a GBS diagnosis.  Id. at 10.  Dr. Kreple explained that "MRI can show enhancement of spinal nerve roots in GBS—thus [Petitioner's] MRI shows no supporting evidence of GBS."  Id. at 9.  Petitioner's lumbar puncture showed no albuminocytologic dissociation (i.e., no elevated CSF protein).  Id.  While Dr. Kreple acknowledged that normal CSF protein levels does not rule out a diagnosis of GBS, he opined "this testing also shows no supporting evidence of GBS in this case."  Id.

For the above discussed reasons, Dr. Kreple concluded "it is absolutely more likely than not that . . . [P]etitioner did not develop GBS."  Resp. Ex. A at 12.

### iii.    Chronic Inflammatory Demyelinating Polyradiculoneuropathy

Dr. Kreple agreed with Dr. Shafrir's opinion that Petitioner did not have CIDP.  Resp. Ex. A at 10.

Dr. Kreple explained CIDP is diagnosed based on "a combination of clinical, electrodiagnostic, and laboratory data."  Resp. Ex. A at 6.  "Clinical features include progression of symptoms for at least [eight] weeks, absent or diminished reflexes in all limbs, and progressive or relapsing weakness in upper and lower extremities and sensory loss in at least two extremities."  Id. (citing Resp. Ex. A-11).[51]  Electrodiagnostic studies in support of CIDP "require[] demyelinating changes in at least two nerves without an alternative explanation" and Dr. Kreple opined that a EMG/NCS is the "gold standard" for diagnosing CIDP.  Id. at 6, 9 (citing Resp. Ex. A-11).

While CIDP is typically treated with IVIG, Dr. Kreple explained that a response to IVIG "should not be taken as evidence for CIDP."  Resp. Ex. A at 6-7.  Relying on Allen and Lewis,[52] Dr. Kreple explained that IVIG may lead to subjective improvement regardless of the disease etiology.  Id. at 7 (citing Resp. Ex. A-1).  Additionally, IVIG has been associated with a significant placebo response.  Id. at 8 (citing Resp. Ex. A-1).  Allen and Lewis performed a retrospective review of 59 patients who received a referral for CIDP and identified that 47% (27 patients) failed to meet the minimum diagnostic criteria.  Resp. Ex. A-1 at 1-2.  Of the

---

[50] F.G.A. van der Meché & P.I. Schmitz, A Randomized Trial Comparing Intravenous Immune Globulin and Plasma Exchange in Guillain-Barré Syndrome, 326 NEJM 1123 (1992).

[51] Peter Y.K. Van den Bergh et al., European Academy of Neurology/Peripheral Nerve Society Guidelines on Diagnosis and Treatment of Chronic Inflammatory Demyelinating Polyradiculoneuropathy: Report of a Joint Task Force–Second Revision, 26 J. Peripher. Nerv. Sys. 243 (2021)

[52] Jeffery A. Allen & Richard A. Lewis, CIDP Diagnostic Pitfalls and Perception of Treatment Benefit, 85 Neurology 498 (2015).

misdiagnosed patients, 75% had subjective improvement to IVIG treatment.  Id. at 5 tbl. 3. The authors concluded that a subjective response to IVIG "may contribute to CIDP misdiagnosis." Id. at 5.  The authors also noted that atypical clinical features played a role in misdiagnosis and identified NCS interpretations to be "a major factor in misdiagnosis."  Id. at 4.  Of note, the authors identified peroneal nerve findings as one of four patterns of electrodiagnostic findings common in the misdiagnosed patients.  Id.

Arguing against a diagnosis of CIDP, Dr. Kreple opined that neither of Petitioner's EMG/NCS studies showed evidence of demyelinating polyneuropathy, as would be expected. Resp. Ex. A at 9-10.  Dr. Kreple noted that Petitioner had "at least subjective improvement" from her IVIG treatment, but he emphasized that a responsive to IVIG "does not at all suggest a diagnosis of CIDP."  Id.  Finally, Dr. Kreple opined that Petitioner's symptoms of "intermittent double vision, difficulty with urinating, and a tremor . . . would not typically be seen in the setting of CIDP (with the occasional exception of tremor)."  Id. at 10.

### c.    Causation Opinion

Dr. Kreple opined "it is more likely than not that the vaccination did not play a role in [Petitioner's] symptoms."  Resp. Ex. A at 12.  While Dr. Kreple opined there was lack of evidence to support a diagnosis of GBS, he also opined there was "lack of evidence that flu vaccines can cause GBS (particularly within one day of vaccination)."  Id.

Dr. Kreple acknowledged that "[s]ome studies have indicated a slightly increased risk [of GBS] associated with [flu] vaccination."  Resp. Ex. A at 7 (citing Resp. Ex. A-7 at 1 (finding an increased risk of 1.6 cases of GBS per 1 million people vaccinated with 2009 H1N1 flu vaccine)).[53]  However, Dr. Kreple argued that this association "has been called into question" by subsequent large scale epidemiological studies that showed no significant association between seasonal flu vaccinations and GBS.  Id. (citing Resp. Ex. A-2;[54] Resp. Ex. A-6).[55]  Using data from all U.S. Medicare beneficiaries who received any flu vaccine during the 2017-2018 flu season, Perez-Vilar et al. did not identify an increased GBS risk following the 2017-2018 seasonal flu vaccinations.  Resp. Ex. A-6 at 1-2.  Using a similar approach, the study from Arya et al. did not find an excess GBS risk following the 2015-2016 and 2016-2017 seasonal flu vaccines.  Resp. Ex. A-2 at 1.

---

[53] Daniel A. Salmon et al., Association Between Guillain-Barre Syndrome and Influenza A (H1N1) 2009 Monovalent Inactivated Vaccine in the USA: A Meta-Analysis, 381 Lancet 1461 (2013).

[54] Deepa P. Arya et al., Surveillance for Guillain-Barre Syndrome After 2015-2016 and 2016-2017 Influenza Vaccination of Medicare Beneficiaries, 37 Vaccine 6543 (2019).

[55] Silvia Perez-Vilar et al., Surveillance for Guillain-Barre Syndrome After Influenza Vaccination Among U.S. Medicare Beneficiaries During the 2017-2018 Season, 37 Vaccine 3856 (2019).

Responding to Dr. Shafir's report, Dr. Kreple criticized Dr. Shafrir's reliance on epidemiological studies linking GBS to the 1976 swine flu vaccine. Resp. Ex. A at 11 (citing Pet. Ex. 17 at 37-40). Dr. Kreple characterized this reliance as "problematic" as he opined that the "current seasonal flu vaccinations do not carry a similar risk." Id. Dr. Kreple concluded that "the epidemiological data and the sum of available evidence on modern seasonal flu vaccines do not establish a link" to GBS. Id.

Dr. Kreple also criticized Dr. Shafrir's purported casual mechanisms ("molecular mimicry and other non-specific or 'unknown' mechanisms") as "brief and vague" and not demonstrative of a link between the flu vaccine and GBS. Resp. Ex. A at 11 (citing Pet. Ex. 17 at 37-38).

Finally, Dr. Kreple disagreed that Dr. Shafrir's cytokine theory supported a one-day onset. Resp. Ex. A at 11. Dr. Kreple opined that "an increase in cytokines after flu vaccination, B cell responses, and individual variability in cytokine response do not show that the seasonal flu vaccine can cause GBS, let alone that it can cause GBS within one day of vaccination." Id. (citing Pet. Ex. 17 at 38-42).

## III.    LEGAL FRAMEWORK

### A.    Standards for Adjudication

The Vaccine Act was established to compensate vaccine-related injuries and deaths. § 10(a). "Congress designed the Vaccine Program to supplement the state law civil tort system as a simple, fair and expeditious means for compensating vaccine-related injured persons. The Program was established to award 'vaccine-injured persons quickly, easily, and with certainty and generosity.'" Rooks v. Sec'y of Health & Hum. Servs., 35 Fed. Cl. 1, 7 (1996) (quoting H.R. Rep. No. 908 at 3, reprinted in 1986 U.S.C.C.A.N. at 6287, 6344).

Petitioner's burden of proof is by a preponderance of the evidence. § 13(a)(1). The preponderance standard requires a petitioner to demonstrate that it is more likely than not that the vaccine at issue caused the injury. Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991). Petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1325 (Fed. Cir. 2006). Instead, Petitioner may satisfy her burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

In particular, a petitioner must prove that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." Moberly, 592 F.3d at 1321 (quoting Shyface v. Sec'y of Health & Hum. Servs., 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); see also Pafford v. Sec'y of Health & Hum. Servs., 451 F.3d 1352, 1355 (Fed. Cir. 2006). The received vaccine, however, need not be the predominant cause of the injury. Shyface, 165 F.3d at 1351. A petitioner who satisfies this burden is entitled to compensation unless Respondent

32

can prove, by a preponderance of the evidence, that the vaccinee's injury is "due to factors unrelated to the administration of the vaccine." § 13(a)(1)(B). However, if a petitioner fails to establish a prima facie case, the burden does not shift. Bradley v. Sec'y of Health & Hum. Servs., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

"Regardless of whether the burden ever shifts to the [R]espondent, the special master may consider the evidence presented by the [R]espondent in determining whether the [P]etitioner has established a prima facie case." Flores v. Sec'y of Health & Hum. Servs., 115 Fed. Cl. 157, 162-63 (2014); see also Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373, 1379 (Fed. Cir. 2012) ("[E]vidence of other possible sources of injury can be relevant not only to the 'factors unrelated' defense, but also to whether a prima facie showing has been made that the vaccine was a substantial factor in causing the injury in question."); de Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1353 (Fed. Cir. 2008) ("The government, like any defendant, is permitted to offer evidence to demonstrate the inadequacy of the [P]etitioner's evidence on a requisite element of the [P]etitioner's case-in-chief."); Pafford, 451 F.3d at 1358-59 ("[T]he presence of multiple potential causative agents makes it difficult to attribute 'but for' causation to the vaccination. . . . [T]he Special Master properly introduced the presence of the other unrelated contemporaneous events as just as likely to have been the triggering event as the vaccinations.").

## B.      Factual Issues

Petitioner must prove, by a preponderance of the evidence, the factual circumstances surrounding her claim. § 13(a)(1)(A). To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records).

Medical records, specifically contemporaneous medical records, are presumed to be accurate and generally "warrant consideration as trustworthy evidence." Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). But see Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021) (rejecting the presumption that "medical records are accurate and complete as to all the patient's physical conditions"); Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 538 (2011) ("[T]he absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." (quoting Murphy v. Sec'y of Health & Hum. Servs., 23 Cl. Ct. 726, 733 (1991), aff'd per curiam, 968 F.2d 1226 (Fed. Cir. 1992))), recons. den'd after remand, 105 Fed. Cl. 353 (2012), aff'd mem., 503 F. App'x 952 (Fed. Cir. 2013). The weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." Id. To overcome the presumptive accuracy of medical records, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." Sanchez v. Sec'y of Health & Hum. Servs., No. 11-685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing Blutstein v. Sec'y of Health & Hum. Servs., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30,

1998)), <u>mot. for rev. den'd</u>, 142 Fed. Cl. 247 (2019), <u>vacated on other grounds & remanded</u>, 809 F. App'x 843 (Fed Cir. 2020).

There are situations in which compelling testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. <u>Campbell v. Sec'y of Health & Hum. Servs.</u>, 69 Fed. Cl. 775, 779 (2006) ("[L]ike any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking."); <u>Lowrie v. Sec'y of Health & Hum. Servs.</u>, No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("[W]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting <u>Murphy</u>, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. <u>Andreu v. Sec'y of Health & Hum. Servs.</u>, 569 F.3d 1367, 1379 (Fed. Cir. 2009); <u>Bradley</u>, 991 F.2d at 1575.

Despite the weight afforded medical records, special masters are not bound rigidly by those records in determining onset of a petitioner's symptoms. <u>Valenzuela v. Sec'y of Health & Hum. Servs.</u>, No. 90-1002V, 1991 WL 182241, at *3 (Fed. Cl. Spec. Mstr. Aug. 30, 1991); <u>see also Eng v. Sec'y of Health & Hum. Servs.</u>, No. 90-1754V, 1994 WL 67704, at *3 (Fed. Cl. Spec. Mstr. Feb. 18, 1994) (Section 13(b)(2) "must be construed so as to give effect also to § 13(b)(1) which directs the special master or court to consider the medical records (reports, diagnosis, conclusions, medical judgment, test reports, etc.), but does not require the special master or court to be bound by them").

## C.    Causation

To receive compensation through the Program, Petitioner must prove either (1) that she suffered a "Table Injury"—i.e., an injury listed on the Vaccine Injury Table—corresponding to a vaccine that she received, or (2) that she suffered an injury that was actually caused by a vaccination. <u>See</u> §§ 11(c)(1), 13(a)(1)(A); <u>Capizzano</u>, 440 F.3d at 1319-20. Petitioner must show that the vaccine was "not only a but-for cause of the injury but also a substantial factor in bringing about the injury." <u>Moberly</u>, 592 F.3d at 1321 (quoting <u>Shyface</u>, 165 F.3d at 1352-53).

Because Petitioner does not allege she suffered a Table Injury, she must prove a vaccine actually caused her injury. To do so, Petitioner must establish, by preponderant evidence: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." <u>Althen</u>, 418 F.3d at 1278.

The causation theory must relate to the injury alleged. Petitioner must provide a sound and reliable medical or scientific explanation that pertains specifically to this case, although the explanation need only be "legally probable, not medically or scientifically certain." <u>Knudsen v. Sec'y of Health & Hum. Servs.</u>, 35 F.3d 543, 548-49 (Fed. Cir. 1994). Petitioner cannot establish entitlement to compensation based solely on her assertions; rather, a vaccine claim must be supported either by medical records or by the opinion of a medical doctor. § 13(a)(1). In determining whether Petitioner is entitled to compensation, the special master shall consider all

material in the record, including "any . . . conclusion, [or] medical judgment . . . which is contained in the record regarding . . . causation." § 13(b)(1)(A). The special master must weigh the submitted evidence and the testimony of the parties' proffered experts and rule in Petitioner's favor when the evidence weighs in her favor. See Moberly, 592 F.3d at 1325-26 ("Finders of fact are entitled—indeed, expected—to make determinations as to the reliability of the evidence presented to them and, if appropriate, as to the credibility of the persons presenting that evidence."); Althen, 418 F.3d at 1280 (noting that "close calls" are resolved in Petitioner's favor).

Testimony that merely expresses the possibility—not the probability—is insufficient, by itself, to substantiate a claim that such an injury occurred. See Waterman v. Sec'y of Health & Hum. Servs., 123 Fed. Cl. 564, 573-74 (2015) (denying Petitioner's motion for review and noting that a possible causal link was not sufficient to meet the preponderance standard). The Federal Circuit has made clear that the mere possibility of a link between a vaccination and a petitioner's injury is not sufficient to satisfy the preponderance standard. Moberly, 592 F.3d at 1322 (emphasizing that "proof of a 'plausible' or 'possible' causal link between the vaccine and the injury" does not equate to proof of causation by a preponderance of the evidence); Boatmon v. Sec'y of Health & Hum. Servs., 941 F.3d 1351, 1359-60 (Fed. Cir. 2019). While certainty is by no means required, a possible mechanism does not rise to the level of preponderance. Moberly, 592 F.3d at 1322; see also de Bazan, 539 F.3d at 1351.

## IV.    ANALYSIS

### A.    Diagnosis

As Federal Circuit precedent establishes, in certain cases it is appropriate to determine the nature of an injury before engaging in the Althen analysis. Broekelschen v. Sec'y of Health & Hum. Servs., 618 F.3d 1339, 1346 (Fed. Cir. 2010). Since "each prong of the Althen test is decided relative to the injury[,]" determining facts relating to the claimed injury can be significant in a case where diagnosis is not clear. Id. Here, the parties dispute diagnosis, and so it is appropriate to first resolve that issue.

For the below discussed reasons, the undersigned finds Petitioner's post-vaccination diagnosis was GBS.

The first reason for this finding is based on the records and opinions of Petitioner's treating neurologist, Dr. Schmidt. The undersigned gives weight to the statements of Petitioner's treating physicians as they are "in the best position" to determine Petitioner's injury. See Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326; Cucuras, 993 F.2d at 1528 (noting contemporaneous medical records, "in general, warrant consideration as trustworthy evidence"). Here, Petitioner's treating neurologist, Dr. Schmidt, diagnosed and treated Petitioner for GBS during her post-vaccination hospitalization and subsequent outpatient visits.

During Petitioner's hospitalization in August 2019, Dr. Schmidt opined Petitioner reported inconsistent neurological symptoms, and "may be" suffering from conversion reaction, but he also documented a thorough history, an abnormal sensory examination, and that she had

35

slightly reduced strength in her lower extremities, supportive of his clinical diagnosis of GBS. See Pet. Ex. 5 at 29-31. Since Dr. Schmidt was Petitioner's treating neurologist, the undersigned assigns significant weight to his examination and diagnosis opinions. Dr. Schmidt continued to document the diagnosis of GBS in his post-hospitalization records for Petitioner. See id. at 17-18 (GBS with CIDP), 23 (same), 26-27 ("recent history of GBS"). In November 2019, Dr. Schmidt again documented that Petitioner had slightly reduced strength in her lower extremities, but at this visit her reflexes were absent, and her gait was abnormal and described as ataxic. Id. at 26-27. Dr. Schmidt's diagnosis remained GBS.

Further, although Petitioner's treating physicians, including Dr. Schmidt, considered conversion disorder (i.e., FND) during her initial hospitalization, she was not diagnosed with this condition and was not treated for it. Instead, she was diagnosed with GBS and treated with IVIG, the first line treatment for GBS.

Second, the undersigned finds that Petitioner did not have CIDP. Petitioner's expert, Dr. Shafrir, opines that Petitioner did not have CIDP. See Pet. Ex. 17 at 35-36 (noting CIDP was "very unlikely"). Respondent's expert, Dr. Kreple agrees that Petitioner did not have CIDP. Resp. Ex. A at 10 ("[T]here [was] no meaningful evidence to suggest a diagnosis of CIDP."). Since the parties did not raise the issue of CIDP in their joint submission, and there is agreement by the experts that Petitioner did not have CIDP, the undersigned finds Petitioner did not have CIDP, and otherwise does not address the diagnosis of CIDP herein.

Third, while Dr. Kreple raised valid points regarding FND and GBS, the undersigned finds that Dr. Shafrir provided persuasive opinions supporting Petitioner's diagnosis of GBS, as well as reasons why her CSF and MRI studies were not diagnostic of GBS. He opined Petitioner developed ascending numbness in a glove and stocking distribution and lower extremity weakness, along with balance problem and bladder problems which can be seen clinically in GBS. Because Petitioner's clinical deficits occurred rapidly and she was admitted early during her course of GBS, Dr. Shafrir opined that her studies were not yet diagnostic of GBS. Additionally, Dr. Shafrir explained that a normal CSF protein level does not rule out GBS since this study is normal is about 10% of patients with GBS. Although Dr. Shafrir acknowledged that Petitioner's presentation raised the possibility of a functional disorder, the fact that she had persistent neurological and sensory deficits and an absence of reflexes supported a GBS diagnosis.

Subsequently, in 2024, Petitioner saw Dr. Leung, a neuromuscular specialist, due to a referral by Dr. Schmidt. After EMG diagnostic testing and evaluation, Dr. Leung opined that Petitioner's "ongoing prominent symptoms" were "not consistent with an ongoing demyelinating neuropathy such as GBS or CIDP." Pet. Ex. 51 at 4. He questioned whether Petitioner had "a superimposed component of functional neurologic symptom disorder." Id. at 21. And although Dr. Leung questioned the diagnosis of GBS made in 2019, he limited his opinion to the question of whether Petitioner had any ongoing demyelinating neuropathic condition. The undersigned interprets Dr. Leung's statements as suggesting that Petitioner may have previously had GBS with a superimposed component of FND. Relevant to 2024, Dr. Leung opined that Petitioner's "ongoing [] symptoms" were not consistent with an "ongoing" demyelinating neuropathy. Id. at

36

4. Based his used of the word "ongoing," the undersigned does not interpret Dr. Leung's opinion in 2024 to relate back or otherwise negate the diagnosis of GBS made by Dr. Schmidt in 2019.

### B.    Causation

#### 1.    __Althen__ Prong One

Under Althen prong one, Petitioner must set forth a medical theory explaining how the received vaccine could have caused the sustained injury. Andreu, 569 F.3d at 1375; Pafford, 451 F.3d at 1355-56. Petitioner's theory of causation need not be medically or scientifically certain, but it must be informed by a "sound and reliable" medical or scientific explanation. Boatmon, 941 F.3d at 1359; see also Knudsen, 35 F.3d at 548; Veryzer v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 214, 257 (2011) (noting that special masters are bound by both § 13(b)(1) and Vaccine Rule 8(b)(1) to consider only evidence that is both "relevant" and "reliable"). If Petitioner relies upon a medical opinion to support her theory, the basis for the opinion and the reliability of that basis must be considered in the determination of how much weight to afford the offered opinion. See Broekelschen, 618 F.3d at 1347 ("The special master's decision often times is based on the credibility of the experts and the relative persuasiveness of their competing theories."); Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375, 1377 n.6 (Fed. Cir. 1994) (stating that an "expert opinion is no better than the soundness of the reasons supporting it" (citing Fehrs v. United States, 620 F.2d 255, 265 (Ct. Cl. 1980))).

The undersigned finds that Petitioner has failed to prove a sound and reliable causal theory to satisfy Althen prong one by preponderant evidence for the following reasons.

First, the undersigned finds that Petitioner has failed to prove that Dr. Shafrir's theory of causation based on cytokines is sound and reliable. Dr. Shafrir focuses on cytokines due to the one-day onset relevant here. The literature he cites in support of a theory based on cytokine induction of GBS describes cytokines as messenger molecules and/or focuses on their proinflammatory responses in the context of the adaptive immune system. Dr. Shafrir, however, offers no literature or other evidence suggesting that GBS can be triggered by a cytokine response outside of the framework of the adaptive immune response.

In support of the role of the innate immune system and cytokines, Dr. Shafrir relies on Israeli et al., who state that GBS is seen "in association with other autoimmune diseases, changes in T cell subclasses, and change in cytokine profile." Pet. Ex. 17 at 37 (quoting Pet. Ex. 29 at 2). Israeli et al., however, do not suggest that cytokines induce GBS or that GBS is an innate immune system disease.

Dr. Shafrir states that other authors have described the importance of the innate immune system in GBS. However, none of the papers referenced by Dr. Shafrir identify cytokines and/or the innate immune system as the causal mechanism of GBS. Lu and Zhu reference molecular mimicry as the mechanism involved in post-infectious GBS; Sun et al. reported that some cytokines are elevated in GBS, but they do not attribute the pathogenesis to the innate immune system; and Soltani et al. provide a thorough discussion of the role of cytokines, but they acknowledge that GBS is caused by an autoimmune reaction—molecular mimicry. Dr. Shafrir

37

also argues that treatment for GBS with IVIG supports a role for cytokines in the cause of GBS. Again, none of these articles support this aspect of Dr. Shafrir's opinion or suggest that cytokines or the innate immune response are implicated as a causal mechanism of GBS.

Second, because the undersigned finds that Dr. Shafrir's opinions lack foundational support, they are conclusory in nature. When evaluating whether petitioners have carried their burden of proof, special masters consistently reject "conclusory expert statements that are not themselves backed up with reliable scientific support." Kreizenbeck v. Sec'y of Health & Hum. Servs., No. 08-209V, 2018 WL 3679843, at *31 (Fed. Cl. Spec. Mstr. June 22, 2018), mot. for rev. den'd, decision aff'd, 141 Fed. Cl. 138 (2018), aff'd, 945 F.3d 1362 (Fed. Cir. 2020). The undersigned will not rely on "opinion evidence that is connected to existing data only by the ipse dixit of the expert." Prokopeas v. Sec'y of Health & Hum. Servs., No. 04-1717V, 2019 WL 2509626, at *19 (Fed. Cl. Spec. Mstr. May 24, 2019) (quoting Moberly, 592 F.3d at 1315). Instead, special masters are expected to carefully scrutinize the reliability of each expert report submitted. Id.

Third, the undersigned is not aware of any Vaccine Act case where a mechanism based on cytokine-induced inflammation has been found to cause GBS and satisfy the preponderant evidence standard of Althen prong one. Instead, cytokine theories have generally been rejected as triggering vaccine-related autoimmune diseases. See, e.g., Dixon-Jones v. Sec'y of Health & Hum. Servs., No. 14-934V, 2019 WL 7556374, at *43 (Fed. Cl. Spec. Mstr. Sept. 4, 2019) (noting "special masters have found that general cytokine-based theories of causation are not persuasive" and listing cases); Sciortino v. Sec'y of Health & Hum. Servs., No. 22-99V, 2024 WL 4579389, at *13 (Fed. Cl. Spec. Mstr. July 24, 2024) (finding the petitioner's proposed cytokine driven process unpersuasive in a polymyalgia rheumatica claim); Landis v. Sec'y of Health & Hum. Servs., No. 15-1562V, 2019 WL 7844617, at *11 (Fed. Cl. Spec. Mstr. Aug. 20, 2019) (citing cases and rejecting theory that cytokines cause osteoarthritis); Baron v. Sec'y of Health & Hum. Servs., No. 14-341V, 2019 WL 2273484, at *18-19 (Fed. Cl. Spec. Mstr. Mar. 18, 2019) (rejecting theory that cytokines cause anti-NMDA encephalitis); Langley v. Sec'y of Health & Hum. Servs., No. 17-837V, 2022 WL 897959, at *15 (Fed. Cl. Spec. Mstr. Mar. 3, 2022) (rejecting theory that cytokines can cause an anxiety disorder and citing supportive cases).

Lastly, in addition to the opinions expressed by Dr. Shafrir related to cytokines and the innate immune system, he also opined that the adaptive immune system (molecular mimicry) is relevant to causation in post-vaccination GBS. Molecular mimicry is generally accepted as causal mechanism in flu/GBS claims. See, e.g., Romero v. Sec'y of Health & Hum. Servs., No. 18-1625V, 2026 WL 1079702, at *21 (Fed. Cl. Spec. Mstr. Mar. 25, 2026) ("[W]hile not dispositive or binding, . . . Special Masters have routinely found in favor of petitioners on Prong [one] in flu/GBS cases based in molecular mimicry."). However, while molecular mimicry is an accepted scientific mechanism, generally opining that molecular mimicry is a causal theory, without more, is insufficient. See, e.g., Loyd ex rel. Loyd v. Sec'y of Health & Hum. Servs., No. 16 811V, 2021 WL 2708941, at *31 (Fed. Cl. Spec. Mstr. May 20, 2021) ("[T]hough molecular mimicry is a generally accepted scientific concept, and is frequently invoked in Program cases, the mere mention of it does not constitute satisfaction of the preponderant evidentiary standard." (internal citations omitted)).

38

In the present case, Dr. Shafrir acknowledges molecular mimicry as a "major mechanism for the causation of [GBS] by vaccination" while simultaneously opining that the "mechanisms by which [flu] vaccine causes GBS" are "completely unknown" and that "there is no well proven mechanism" for GBS following flu vaccination. Pet. Ex. 17 at 37-38. Dr. Shafrir's opinions on molecular mimicry and the role of the adaptive immune systems are confusing and contradictory and do not constitute preponderant evidence of Althen prong one. Importantly, even assuming Petitioner provided evidence of molecular mimicry as a sound and reliable causal mechanism under Althen prong one, the undersigned notes that a one-day onset is not consistent with the theory of molecular mimicry. See, e.g., Martinez v. Sec'y of Health & Hum. Servs., No. 16-736V, 2022 WL 4884923, at *27 (Fed. Cl. Spec. Mstr. Sept. 9, 2022) (finding "a relative short onset" of one day "not medically acceptable" in an "an autoimmune reaction involving antibodies or other immune cells associated with the adaptive[] [] immune response in reaction to antigenic exposure" (emphasis omitted)); see infra Part IV.B.3 (analyzing Althen prong three).

For the above reasons, the undersigned finds Petitioner has failed to prove Althen prong one by preponderant evidence.

### 2.    Althen Prong Two

Under Althen prong two, Petitioner must prove by a preponderance of the evidence that there is a "logical sequence of cause and effect showing that the vaccination was the reason for the injury." Capizzano, 440 F.3d at 1324 (quoting Althen, 418 F.3d at 1278). "Petitioner must show that the vaccine was the 'but for' cause of the harm . . . or in other words, that the vaccine was the 'reason for the injury.'" Pafford, 451 F.3d at 1356 (internal citations omitted).

In evaluating whether this prong is satisfied, the opinions and views of the petitioner's treating physicians are entitled to some weight. Andreu, 569 F.3d at 1367; Capizzano, 440 F.3d at 1326 ("[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" (quoting Althen, 418 F.3d at 1280)). Medical records are generally viewed as trustworthy evidence since they are created contemporaneously with the treatment of the vaccinee. Cucuras, 993 F.2d at 1528. While the medical records and opinions of treating physicians must be considered, they are not binding on the special master. § 13(b)(1)(B) (specifically stating that the "diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court").

A petitioner need not make a specific type of evidentiary showing, i.e., "epidemiologic studies, rechallenge, the presence of pathological markers or genetic predisposition, or general acceptance in the scientific or medical communities to establish a logical sequence of cause and effect." Capizzano, 440 F.3d at 1325. Instead, Petitioner may satisfy his burden by presenting circumstantial evidence and reliable medical opinions. Id. at 1325-26.

The undersigned finds that Petitioner has not proven Althen prong two by preponderant evidence for the following reasons.

39

Dr. Shafrir offered a short paragraph regarding prong two stating, "[d]ue to an inherent dysregulation of [Petitioner's] innate immune system, the vaccine [] produced an abnormal activation of the innate immune systems, which probably included exaggerated cytokines" and this produced "an increase in inflammatory activity in her nerve roots and peripheral nerves" causing GBS. Pet. Ex. 17 at 44.

There are several problems with this opinion. First, Dr. Shafrir did not explain what he meant by "an inherent dysregulation" of Petitioner's innate immune system. See Pet. Ex. 17 at 44. There is no suggestion in Petitioner's medical records that she suffered from any immune system dysregulation. She had no diagnosis of immune dysregulation. Dr. Shafrir's expert report includes a lengthy detailed summary of Petitioner's medical history and her records but does not identify any factual support for this opinion.

Next, Dr. Shafrir offered no explanation or factual basis for his opinion that the vaccine "produced an abnormal activation" of her innate immune system. See Pet. Ex. 17 at 44. Again, there is no indication in Petitioner's medical records of exaggerated cytokines. Her CSF did not show elevated protein or other indication of an inflammatory response to the vaccination. Petitioner's records offer no evidence to support a diagnosis of an aberrant or exaggerated immune response.

A review of Petitioner's records show that the day after her flu vaccination, on August 12, 2019, when she presented to the walk-in clinic, she had a "subjective fever and left upper arm pain." Pet. Ex. 17 at 5 (citing Pet. Ex. 1 at 2, Pet. Ex. 6 at 75). Although she had a subjective fever, her temperature was normal. She had warmth and redness on the left anterior upper arm and was diagnosed with an adverse effect and allergic reaction to her flu vaccine. Reassurance was given, and she was instructed to use cold compresses and Tylenol or ibuprofen. She was later treated for cellulitis at the site of her flu vaccine injection and received an antibiotic. While Petitioner had a local adverse reaction with cellulitis, there is no indication that her treating physicians that they thought she had a dysregulated immune reaction or that her flu vaccine caused any such disorder.

In summary, while Petitioner had a local site reaction to her vaccination, Dr. Shafrir does not provide evidence to connect this adverse reaction to an aberrant cytokine response to the flu vaccination which caused her GBS. Therefore, the undersigned finds Petitioner has failed to provide preponderant evidence of Althen prong two.

### 3.    Althen Prong Three

Althen prong three requires Petitioner to establish a "proximate temporal relationship" between the vaccination and the injury alleged. Althen, 418 F.3d at 1281. That phrase has been defined as a "medically acceptable temporal relationship." Id. A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe for which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation-in-fact." de Bazan, 539 F.3d at 1352. The explanation for what is a medically acceptable time frame must also coincide with the theory of how the relevant vaccine can cause the injury alleged (under Althen prong one). Id.; Koehn v. Sec'y of Health & Hum. Servs., 773

40

F.3d 1579, 1243 (Fed. Cir. 2014); Shapiro, 101 Fed. Cl. at 542. Thus, prong three contains two parts. First, Petitioner must establish the "timeframe for which it is medically acceptable to infer causation" and second, they must demonstrate that the onset of the disease occurred in this period. Shapiro, 101 Fed. Cl. at 542-43.

Petitioner received her vaccinations on August 11, 2019, and the medical records show that she complained of bilateral upper extremity weakness at the walk-in clinic at Oroville Hospital the next day, August 12. Later that day she complained of bilateral leg numbness and weakness. Both Dr. Shafrir and Dr. Kreple agreed that Petitioner's onset of symptoms was one day after vaccination. In her affidavit, Petitioner avers that she developed numbness and weakness in her legs on August 12, 2019. Therefore, the undersigned finds the weight of the evidence supports a finding that onset occurred one day after vaccination.

Dr. Shafrir agreed that a one-day onset "may raise questions about the biological feasibility" of vaccine causation, and so he offered two explanations for this "short time interval." Pet. Ex. 17 at 38.

His first explanation is based on a secondary anamnestic response (an adaptive immune response) which he asserts peaks in one to three days. However, Dr. Shafrir did not provide a robust explanation of how a secondary anamnestic response could cause an autoimmune condition, such as GBS, to occur within one-day of a vaccination. Further, he did not identify whether Petitioner previously received the same or similar flu vaccine that she received August 11, 2019, nor did he discuss whether Petitioner's 2014 and 2018 flu vaccines provided a primary exposure to the same antigens as her 2019 flu vaccine. There is no evidence to show what strains of the flu were in each vaccine she received, or what antigens were in any of the prior vaccinations or the 2019 vaccination. Without foundational evidence showing that Petitioner had a primary exposure to the same antigens, there is no evidence to support a secondary immune response. See, e.g., Brancheau, 2024 WL 1619606, at *24 (rejecting a similar recall response theory in a one-day onset claim after the petitioner failed to identify what strains of the flu were in each vaccine she received).

Further, the medical literature provided by Dr. Shafrir that discussed GBS in the context of an adaptive immune response did not provide support for a one-day onset. See, e.g., Pet. Ex. 25 at 2 (stating GBS occurs five days to three weeks after trigger); Pet. Ex. 28 at 4 (concluding a one-day "onset of GBS was too short to warrant a causal relationship"); Pet. Ex. 29 at 4 (onset ranges from "as short as [three to five] days, to [six to ten] weeks").

Dr. Shafrir's second and "more likely" explanation of how a one-day onset can occur is based on his cytokine theory. Pet. Ex. 17 at 41. He opined that proinflammatory cytokines increase "within hours" and "produce a cascade of multiple immune and inflammatory reactions, the results of which can take days to appear." Id. Here, however, Petitioner had symptoms in one day, not days. Further, Dr. Shafrir did not explain what he meant by a "cascade of multiple immune and inflammatory reactions." Id. Literature relied on by Dr. Shafrir discussed conditions Petitioner did not have or focused on local reactions and systemic side effects such as fever or myalgias. For example, Kany et al. discussed cytokines and their role as inflammatory mediators in shock, immune dysregulation, osteoporosis, and critical illnesses but there is no

41

indication that Petitioner experienced any of these conditions.  And, as discussed above, Dr. Shafrir did not explain how cytokines or the innate immune response are implicated as a causal mechanism of GBS.

Next, while Dr. Shafrir cited case reports of GBS with one day onset after vaccines, these case studies are insufficient to establish an appropriate onset period for a specific theory of causation which is not discussed or developed in the case reports.  While case reports may have some probative value, they are generally considered weak evidence.  See, e.g., Crutchfield v. Sec'y of Health & Hum. Servs., No. 09-0039V, 2014 WL 1665227, at *19 (Fed. Cl. Spec. Mstr. Apr. 7, 2014) (noting that a "single case report of Disease X occurring after Factor Y . . . do[es] not offer strong evidence that the temporal relationship is a causal one—the temporal relationship could be pure random chance" (emphasis omitted)), mot. for rev. denied, 125 Fed. Cl. 251 (2014).  Further, while Schonberger et al. and Polakowski et al. both report cases of GBS within one day of vaccination, special masters have routinely found that these studies do not provide sufficient support for a one-day onset of GBS.  See, e.g., Defenza v. Sec'y of Health & Hum. Servs., No. 18-1601V, 2026 WL 473297, at *13-16 (Fed. Cl. Spec. Mstr. Jan. 7, 2026) (providing an in-depth explanation of Schonberger et al. and Polakowski et al. relative to one day onset).

In addition to the lack of supportive evidence that the flu vaccine at issue here can cause GBS one day after vaccination, the undersigned notes one-day onset of GBS following flu vaccination has consistently been rejected.  See, e.g., Defenza, 2026 WL 473297, at *6-19 (finding multiple immunological explanations, including recall response and increased IL-6 cytokine levels, were unsupportive of 24-hour GBS onset); Beckwith v. Sec'y of Health & Hum. Servs., No. 21-1660V, 2025 WL 2815711, at *16-19 (Fed. Cl. Spec. Mstr. Aug. 29, 2025) (rejecting onset of GBS "not quite two days post-vaccination"), mot. for rev. denied, 180 Fed. Cl. 368 (2026); Flowers v. Sec'y of Health & Hum. Servs., No. 20-285V, 2024 WL 2828211, at *12-13 (Fed. Cl. Spec. Mstr. May 8, 2024), mot. for rev. denied, 173 Fed. Cl. 613 (2024) (rejecting onset of GBS one to two days after vaccination); Block v. Sec'y of Health & Hum. Servs., No. 19-969V, 2021 WL 5709764, at *4-5 (Fed. Cl. Spec. Mstr. Oct. 29, 2021) (noting a 24-hour onset of GBS was not medically-acceptable where petitioner failed to establish from an immunologic standpoint how GBS could being in such a short timeframe); Rowan, 2020 WL 2954954, at *16-19 (finding a 36-hour post-vaccination onset of GBS for elderly individual was not a medically-acceptable timeframe to support non-Table claim).  But see Lehrman v. Sec'y of Health & Hum. Servs., No. 13-901, 2018 WL 1788477 at *16-19 (Fed. Cl. Spec. Mstr. Mar. 19, 2018) (finding that petitioner preponderantly demonstrated that a 24-hour onset post-vaccination was medically acceptable).[56]

While the above cases are not binding here, the undersigned agrees with the reasoning of other special masters as it relates to onset given the facts and circumstances here.  See Boatmon, 941 F.3d at 1358; Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999).

---

[56] In Lehrman, the petitioner's expert put forward a theory that the petitioner's flu vaccine acted synergistically with an upper respiratory infection to cause GBS within 24 hours of vaccination. 2018 WL 1788477, at *16-19.  No similar circumstances exist in the present case.

For these reasons, the undersigned finds that Petitioner has failed to prove <u>Althen</u> prong three by preponderant evidence.

## V.    CONCLUSION

The undersigned extends her sympathy to Petitioner for the pain and suffering and disability that she has experienced due to her illness.  The undersigned's Decision, however, cannot be decided based upon sympathy, but rather on the evidence and law.

In the absence of a timely filed motion for review pursuant to Vaccine Rule 23, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master

43